LIVINGWAY v. HOUGHTON COUNTY STREET RAILWAY CO.

1. MASTER AND SERVANT — PERSONAL INJURIES — SAFE PLACE TO WORK—FELLOW-SERVANTS.

An electric lineman, injured by the breaking of a pole which was defective when set, two years before, is not barred of recovery against his employer by the rule of fellow-servant, where there is no evidence that any of the linemen employed at the time of the injury were so employed at the time the pole was set, or that they had any knowledge or means of knowledge of the original defect in the pole except by taking it out of the ground.

2. SAME—ASSUMPTION OF RISK.

An electric lineman does not, by his contract of employment, assume the risk of the negligence of the original linemen who set the poles of the system on which he is employed, with whom he did not sustain the relation of co-employé, and whose acts are unknown and unknowable to him.

3. SAME—CONTRIBUTORY NEGLIGENCE—FELLOW-SERVANTS.

In an action against an electric company for injuries to a lineman caused by the breaking of a rotten pole while a wire was being strung, evidence examined, and *held*, that whether the pole broke from its defects or from the negligence of plaintiff or his fellow-servants in tying a rope and wire together so they would not pass through a sheave on the pole, or in starting the drawing team before it should have started, was a question for the jury.

CARPENTER, C. J., and GRANT and HOOKER, JJ., dissenting.

Error to Houghton; Streeter, J. Submitted June 15, 1905. (Docket No. 17.) Decided July 23, 1906.

Case by Daniel E. Livingway against the Houghton County Street Railway Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Gray & Stone*, for appellant.

*P. H. O'Brien* (*Macdonald & McCormack*, of counsel), for appellee.

HOOKER, J.   The plaintiff was a lineman in the employ of the defendant, a corporation engaged in operating an electric trolley line, which it had done for about two years after constructing it.   While engaged with his crew or gang in stringing a feed wire along its trolley poles, he was injured by the breaking and falling of one of the poles, upon which he was at the time at work. His action for damages resulted in a substantial verdict and judgment in his favor, and the defendant has appealed.

It is the claim of the defendant's counsel:

1. The danger of injury from the breaking and falling of the poles was one of the risks assumed by the plaintiff.

2. That the duty of inspecting the poles was a duty of the plaintiff and his gang, and therefore that defendant was not liable for a failure of the defendant to properly inspect the pole and ascertain its condition before setting him at work upon it.

3. That the doctrine of the duty of the master to furnish a safe place to work has no application in this case.

4. That, if plaintiff's injury arose from the negligence of any one, it was that of his fellow-servants.

5. That a verdict should have been directed for the defendant.

It is claimed that there is testimony in the record indicating that the pole in question was decayed at the heart when it was erected, two years before the accident, at the time the road was built, and it seems to have been the plaintiff's claim that, but for this, it might have stood the strain put upon it.   This decay was visible at the butt, but after the pole was set it could not be seen, though it extended several feet above the ground.   The plaintiff was unaware of its condition, and the testimony may perhaps be said to be conflicting as to whether it could have been ascertained by an inspection, though there was testimony tending to show that it might have been by tapping upon the pole with a hammer.

There is nothing to indicate that defendant's officers, or, for that matter, any of its stockholders, knew of the condition of the pole, either when it was set or afterwards.

If it was negligent to set it, the negligence was that of the construction crew or gang, or their foreman.

The plaintiff's counsel contend that this should make no difference, and that the defendant is chargeable with notice of the condition when it was set, and was in duty bound to inform the plaintiff of it before setting him to work where he might suffer from it.

Counsel for the defendant, on the other hand, claim that this was the negligence of a fellow-servant, for the reason that it was set by the same crew or gang with which the plaintiff was afterwards engaged to work, which had charge of all repairs and new construction, or another class of employés having the same duties.

On the day of the accident this crew was stringing a feed wire. A rope about 500 feet long was made fast to the end of a wire, being first carried over the cross-bars of as many poles as the length of the line would permit. A team, hitched to the other end of the rope, was used to draw the rope and wire along, the latter being unwound from a spool, as the operation was proceeded with. A turn in the wire at the corner of Rockland and Pine streets caused the crew to use a sheave upon the pole which afterwards broke, to facilitate the running of the rope and wire, and it is one of the theories that the end of the wire caught in this, or against the cross-bar, and that the horses, being started before it was disengaged, subjected the pole to an unusual and unnecessary strain, which broke it. Defendant's counsel say that this was negligent, and, being the negligence of the plaintiff's co-workers, was that of fellow-servants, and that he should not have been permitted to recover. He was engaged at the particular time in putting in a guy wire at the top of the pole, to guy it to another pole. It is perhaps inferable that, had this been completed before the team started, the pole would not have broken; and defendant's counsel contend that, when required to put on this guy, plaintiff was apprised that the pole was weak, and assumed the risk attendant before climbing the pole to adjust it. If we

understand the claim of plaintiff's counsel in this regard, it is that the guy was to be put on, not to strengthen the pole, but to prevent it being drawn out of place, after the line should again turn, which it was to do after passing another pole; and it is clear that this guy, had it been affixed, must have so strengthened the pole, and so relieved it from the strain naturally and necessarily resulting from its being out of line, as to have rendered danger of its breaking slight; but at all events the team was started before the guy wire was in place, with the result stated.

Counsel for the plaintiff answer the claim that the accident was due to the untimely starting of the team by saying that, if that is true, yet the defective pole was a concurring cause. The pole was about 18 inches at the butt, and the rim around the hollow at the heart was from 3 to $4\frac{1}{2}$ inches thick, according to plaintiff's testimony. He also testified that, when he was up the pole the first time, he noticed that it swayed and pulled over some when the horses were drawing the cable. Was it negligent to use this pole? We are not prepared to hold that it is the duty of a company to remove a pole that is in the least affected by dry rot, or to refrain from setting such. Nor should a jury be permitted to so determine without some evidence to base such finding upon. In the nature of things all poles will sooner or later become affected by decay, and, while their use after they have become so defective as to be a menace would be improper, we cannot say, as matter of law, nor should a jury be permitted to find, without some evidence to base such finding upon, that good railroading forbids the use of poles that are sufficiently sound and strong to sustain the ordinary strains which they are called upon to bear in use. It is common knowledge that trees withstand the storms and gales until their trunks have been reduced to mere shells by decay. This pole was not like a tree, with its load of branches and leaves, standing unsupported, and there is nothing to indicate that it would not have long supported

defendant's wire, but for the strain put upon it by the team. The court should therefore have held that there was no evidence of negligence on the part of the defendant in continuing this pole as a part of its plant, even had it been shown to have knowledge of its condition. This being so, the question of its failure to inspect becomes unimportant, unless its intention to put up a feed wire made it necessary that its linemen should be warned of existing defects in order that they should have a safe place to work.

It is possible to carry the doctrine of safe place beyond the limits of reason. There is a practical, as well as a theoretical, side to all such questions, and the law does not hold a master liable for a degree of care beyond that which is practicable. This company's road was constructed but two years before this accident happened. We discover no evidence that the pole was rotten when set, unless it is to be inferred from the degree of decay two years later. And there is not a scintilla of evidence that any officer of the company had a suspicion that a decayed pole was set. This should dispose of the assertion that defendant concealed the fact that the pole was decayed from the plaintiff. But if the pole was not strong enough to support an unusual strain, though abundantly so for the ordinary purposes, it was not necessarily the duty of the company to take it out. It might proceed to strengthen it for the temporary unusual strain, and it might lawfully hire men whose duty it should be to do this work as a part of the business of stringing the wire, and it would be a lawful, and perhaps the most economical and proper, way to require such men to examine the poles as they proceeded with their work, and determine and make such necessary repairs as to permit the stringing of the wire with safety. Apparently this was the duty of plaintiff's gang.

The plaintiff was an experienced lineman, and must be supposed to know that a rope attached to the top of a pole, 30 or more feet high, with a team exerting its strength

at the other end of the rope, would subject the pole to a dangerous strain, and render it unsafe for a man at the top of the pole.   He stated upon the trial that it was their practice to guy the poles when they exhibited signs of weakness or inability to withstand, without sagging, the necessary strain of stringing the wires.   He was on the pole at the time of the accident for the express purpose of fastening a guy to the top, the other end of which was to be fastened to another pole in line with this one.   It appears, then, that it was expected that poles inadequate to the necessary strain would be found and that they would be made secure in the way mentioned, and it was a part of the risk of the plaintiff's service to make this secure.   He stated in his testimony that he supposed the reason that they were headguying this pole that morning was because it swayed and they were afraid it would pull out of place, or something to that effect.   No one suggests that, had the work of fastening the guy been completed, the pole would have broken.   It was his business to do it, and it was the duty of his fellow workers to wait until this was accomplished before setting the team in motion.   He had heard, or perhaps given, the order to stop drawing the wire until it was done.   We have, then, a case where it is plainly inferable that the pole might safely have been used by the company for some time to come; that it could, and in a few minutes would, have been so stayed as to have enabled it to withstand the unusual strain of tightening the feed wire; that the necessity of precautions to that end was discovered, and steps taken accordingly.   These facts are inconsistent with the theory of negligence on the part of the defendant.

Again, as we have said, the plaintiff's duties comprised the work which he did, and in doing it he assumed the risk of climbing a weak pole.   In the case of *McIsaac* v. *Lighting Co.*, 172 Mass. 89, the supreme court of Massachusetts held that the risk of falling on account of the weakness of the old pole was assumed, and in the more recent case of *Kellogg* v. *Tramway Co.*, 18 Colo. App.

475, the appellate court of Colorado made a similar holding. The court said:

" The controlling question in this case is whether the defendant owed to the plaintiff, whose business it was to work upon poles along the line as occasion might require, the duty to inspect its poles, and inform the plaintiff whether or not any of them were so decayed as to be unsafe to work upon. The plaintiff had worked upon poles in the construction and repair of electric lines many years. When he engaged to work for the defendant, he must have known that it would be his duty to go upon poles that had been set in the ground for an uncertain length of time. He must have known that such poles would decay and become unsafe for him to work upon. He must have known that the work of climbing poles and taking down and putting up wires would often put a strain upon a pole much greater than it would be exposed to in sustaining the wires when they were all in proper position. It must be conceded that in this case negligence was not established by mere proof of an accident. The burden was upon plaintiff to show that the defendant's neglect of some duty caused the accident. We are of opinion that the risk of falling on account of the weakness of old poles was a risk of the business, which the plaintiff assumed by his contract to work as a lineman for the defendant; that, as between the plaintiff and the defendant, the defendant was under no obligation to inspect the poles to see whether they were decayed and unsafe, and there was, therefore, no evidence of negligence on the part of the defendant."

Similar language was used in the *McIsaac Case:*

" The burden was upon him to show that the defendant's neglect of some duty caused the accident. We are of the opinion that there is no evidence that the risk of falling on account of the weakness of old poles was not a risk of the business, which the plaintiff assumed by his contract to work upon such poles. As between the plaintiff and the defendant, the defendant was under no obligation to inspect the poles to see whether they were decayed, and there was, therefore, no evidence of negligence on the part of the defendant."

Our own case of *Krimmel* v. *Illuminating Co.*, 130 Mich. 613, is quite similar in its general features. Counsel seek to distinguish these cases from the present case,

but we think the principle involved is the same in all.   It may be said that although the plaintiff, as a member of the construction gang, assumed the risk of falling through the breaking of weak poles, such risk would not be assumed as to a pole having a hidden weakness, such as rot, especially if the pole had such defect when set by the defendant's employés previous to plaintiff's employment. Divested of all unnecessary particularities, the proposition contended for is this:   When the plaintiff was employed he had the right to assume that there was no pole that had a concealed defect.   It would make no difference whether it was set with knowledge or in ignorance of the defect, for the negligence of the servant who set the pole was the negligence of the master, whether he knew of it or not.   But every experienced lineman must know, and courts will take judicial notice, that all materials suffer deterioration, and a master may employ a servant, or servants, whose duty consists, in part, in keeping his plant in good condition.   He, in effect, says to them:

" You will find weak and unsafe poles in this system. They are to be used as long as they can be made to render service, so long as consistent with the safety of the public. You are to have their care, and you are to report or remové them when necessary, and in working upon them you must take precautions for the safety of yourself and fellow workmen.   I cannot tell you what poles are unsafe, or when they became so, whether when set or later.   It makes no difference.   There they are, as they are, and you must assume the risks attendant upon their present condition."

In the face of such a situation the contention that the employé may claim that he did not take the risk of concealed defects is, in the writer's judgment, a business absurdity, an over-refinement of legal rules, to the point of impracticability.   When decay has rendered repairs necessary to a building, or a ship, or a tall chimney, or a telephone system, the owner must do something about it, looking to the protection of the public and himself.   He may be ignorant as to what the defect is, as well as its remedy.   He employs one skilled to examine and remedy

the trouble, and such employé takes the risks, whatever they are, so long as there is no bad faith, and cannot be heard to say that some contractor who built the structure for the employer or his grantor slighted his work or used poor materials unbeknown to the owner or prospective owner, and that, upon the doctrine of respondeat superior, a duty arose to warn all future employés of the consequent defect, or to remedy it in person, before sending any other person to make general repairs. The true question is, Did this defendant contract to furnish plaintiff a safe place to work, or was it his duty to make the changes, assuming the risk after making such inspection and taking such precautions as the necessities of the case should require? One employed to construct or repair is not entitled to have made safe the very thing he is employed to make or keep safe. See *Manning* v. *Railway Co.*, 105 Mich. 260; *Petaja* v. *Mining Co.*, 106 Mich. 463 (32 L. R. A. 435).

Although the plaintiff was taken into the gang to string the wire, he was taken to do such work as was required of the rest of the gang, and was given increased wages because of his knowledge and experience. We have seen that he did not claim immunity from required risks, because of his employment for a particular purpose, but willingly climbed the pole to aid in putting it in shape to withstand the strain, which it was seen would be unusual. It is beyond question upon this record that the immediate cause of the break was the inopportune application of the strength of the team, and the possible catching of a knot or kink in the rope or wire upon the cross-piece or sheave. There is no evidence justifying the conclusion that the pole would not have withstood this, had the fastening of the guy been completed. The court erred in refusing to direct a verdict for the defendant.

The judgment should be reversed, and a new trial ordered.

CARPENTER, C. J., and GRANT, J., concurred with HOOKER, J.

BLAIR, J.  The facts of this case are sufficiently set forth in the opinion of Mr. Justice HOOKER.  The trial judge submitted the case to the jury upon the theory that it was the duty of the defendant, in the first instance, to provide a reasonably safe pole for the plaintiff's work as a lineman, and that liability would ensue from the failure to discharge such duty.  The defendant contends that the doctrine of "safe place" does not apply, since the linemen were the inspectors and repairers of the poles and charged with the duty of seeing that they were safe. This contention presents the crucial question in the case.

In determining this question the following facts must be considered, which the evidence would warrant the jury in finding:

1. That the pole in question was unsafe and dangerous for the linemen to work upon when it was furnished originally by the defendant and put in by the linemen in constructing the road as part of the permanent plant.

The defendant's witness Ralph, who was foreman of the linemen, testified:

"I wouldn't put in a pole that was rotten, filled with dry rot, or hollow for a diameter of five or six inches, or eight inches, up to ten or twelve or fourteen feet from the butt of the pole.  The reason why I wouldn't put it in is because I wouldn't consider it a safe and proper pole."

2. That the plaintiff was not in the employ of defendant at the time the pole was put in and knew of no defects in it.

3. That the usual tests employed by linemen to determine the safe character of a pole would not have notified plaintiff that it was unsafe.

Ralph testified:

"At times we try poles to ascertain whether any of them are in such a condition as that.  A man can tell generally by looking at a pole, I should think, and sometimes we strike them with anything solid, anything that comes handy, some iron instrument; sounding the pole, and telling by the sound whether it is solid or not.  I never at any time sounded this pole, and do not think

that any one else ever did, under my instructions or otherwise. I don't know whether the condition of this pole could have been detected by sounding with iron instruments or not. I wouldn't say it could. There are different causes that would prevent it giving forth a sound. A pole may be rotten for six inches, or it may be for a foot. It may be for six inches above the ground. I don't know whether the condition of a pole rotten from twelve to fourteen feet above the butt could be detected by sounding. There are very heavy strains which would affect the sound of it, I think. I don't know that it is probable under ordinary circumstances that you could detect it in that way. I have been engaged in this line of business, handling wires, poles, and things of that kind, for quite a while; several years."

Plaintiff testified:

"I know how a person can determine that a pole is hollow. You could tell by looking at the butt. With other poles you can strike on them, and that will tell whether they are hollow or not. I did not know anything about the condition of the pole before I was hurt. After that pole was put in there, a person going up on it or performing the duties as a lineman on it could not determine its condition."

It seems clear to me that the learned trial judge did not err in instructing the jury that the doctrine of safe place applied to this case, unless it must be held that the linemen who set the pole were the fellow-servants of the plaintiff, and that their negligence barred his recovery. I am not prepared to go to that extent. There is no evidence that any of the linemen in defendant's employ at the time of the accident were employed in that capacity at the time the pole was set in the original construction of the road, or that they had any knowledge or means of knowledge of the original defect of the pole, except by taking it out of the ground. There are satisfactory reasons why the linemen who set the pole should not be permitted to complain of the negligence of their employer in furnishing the pole, since their negligence in using it is equal to his in furnishing it. Neither is there any injus-

tice in holding that, where the company has furnished a proper pole in the first instance and committed its inspection to the linemen, all linemen subsequently employed must protect themselves against defects thereafter developing. But I think it would be unjust to hold that the plaintiff cannot complain of the negligence of the defendant, which was the proximate cause of his injury, because of the concurrent negligence of his predecessors, with whom he never was in fact a fellow-servant. Neither, in my opinion, should it be held that the plaintiff in his contract of employment assumed the risk of the negligence of the original linemen who set the pole, with whom he did not sustain the relation of a co-employé, and whose acts were unknown and unknowable to him. He had a right to assume that the company had put in a proper pole two years before, and that the risks which he assumed were such as were incident to the use of such a pole for that length of time.

None of the Michigan cases cited by defendant's counsel disposes of this point. In *Krimmel* v. *Illuminating Co.*, 130 Mich. 613, which is most like the present case, the defendant did not furnish the defective pole, in the first instance, but succeeded to the rights of another company, which had theretofore caused its erection, and defendant had no greater knowledge or means of knowledge than had the plaintiff. Cases holding that, as the general duty of inspection had been committed to the linemen, they could not recover for defects, are not, in my opinion, decisive of this case. The duty of inspection in the first instance, before providing instrumentalities for the use of employés, is unquestionably a duty pertaining to the employer, and the only reason why the linemen cannot complain of a defective pole is because they are the very men selected by the employer to make this inspection for him. In selecting the poles, they are not performing the duty of a servant, but the duty of a master, and, unquestionably, as to all other servants of the company, the master would

145 MICH.—7.

be responsible for their negligence in making an improper selection. This being true, it seems to me to logically follow that only those linemen in the employ of the company at the time of the selection should be held responsible therefor.

Furthermore, in determining this question, it must be borne in mind that there was no evidence what the duties of the linemen were at the time the line was constructed, and for all that appears in this record the company may at that time have had special inspectors outside of their branch of the service. Neither was there any evidence that the company furnished a sufficient number of good poles to the linemen, so that it was unnecessary for them to use the defective pole. The defendant called none of its superior officers, put in no testimony whatever as to the original construction or as to its rules, methods, or custom of caring for its line at that time, but relied solely upon the testimony of the line foreman, Ralph, who "succeeded a man named George M. Towle, who was foreman of the line gang at the time the road was constructed," and whose testimony related to the custom of the linemen since he had been their foreman.

It is also contended that the accident was due to the negligence of plaintiff or his fellow-servants because:

" Nothing could be clearer than that the accident happened by reason of one or both of two causes, viz.: (1) Careless tying of the rope and wire together, so that there was a knot which caught in the sheave, or the careless manipulation of the rope and wire, whereby it or they became kinked in such a manner as to catch in the sheave; or (2) the starting of the team before it should have started. In either case, the negligent act was that of plaintiff himself or one or more of his fellow-servants."

I think the trial judge did not err in submitting these questions to the jury. If the plaintiff had a right to assume that the pole was originally safe when set two years before the accident, then it was for the jury to say whether he was negligent in assuming that such a pole

would stand the strain then put upon it and to be put upon it by starting the team. There is no warrant in the testimony for claiming that any extraordinary strain was put on this pole by starting the team, and the jury might well find, as they did, that if this pole had been what the plaintiff and the teamster had a right to assume it to be, it would have stood the strain successfully. There is no evidence that the pole broke because of the catching of a knot or the kinking or blocking of the wire or rope. Ralph testified:

"At the time the pole broke, it was pulling kind of hard, as anybody can imagine it would. The wire was $1\frac{1}{8}$ inches in diameter. I couldn't say whether there was any stoppage or blockage at the time the pole broke. The wire would pull with a jerk as it formed its curve. It would come around. It would kind of pull, and the form of the curve would come through the block, and then all at once it would catch. It was bending something unusual on that. Therefore we had taken the precaution with it to put it through the sheave. I don't think it had tangled any, or got in a knot in the sheave, or anything of that kind, at the time the pole broke. It didn't work any too good, but it worked better than before we put it through the sheave."

This witness, the most experienced of all those present at the accident, does not pretend to state what caused the pole to break. He says:

"As he came down, the team started, and in some way or other the pole broke, pulling it toward the trolley wire."

Neither does the evidence compel the conclusion that the teamster was negligent in starting his team before the pole was headguyed. There is no evidence that the team was stopped for that purpose. On the contrary, the evidence shows that the team was stopped because the rope had crossed with another feed wire. Whether the headguy was ordered by the foreman for the purpose of temporarily strengthening the pole, or for the permanent pur-

pose of withstanding the strain of the wire when tightened and in use, was a question for the jury.   Ralph says:

"We had Livingway put that guy wire there to hold the strain which would naturally come on the pole. * * * At this time we were just stringing the wire over the cross-bars.   We hadn't begun to tighten the wire yet.   We stretched the wire out first to get it in its position as near as we could, where it was to remain, and then we would tighten it with block and tackle and anchor it permanently."

Plaintiff testified that it was customary to be on the poles while the team was drawing:

"On the morning of the accident, I had occasion to go upon the pole that broke.   I went up to put the rope over it the first time, and then I stayed up there a little time, while the team was pulling it.   I was holding it to keep it from jumping over the pins.   I refer to the rope which was hitched to the cable, and which was drawing the cable.   Then I came down and the other lineman went back.   He saw that the rope crossed with another feed wire that was there and he hallooed for the team to stop. * * *

"Afterwards I was going up to headguy the pole.   I was doing that because Mr. Ralph said to headguy it. We headguy poles for different occasions.   Sometimes they pull over—pull over the line; lean out onto the track or something.   They get out of place if they are not head-guyed.   There might be other reasons.   I do not know as I know them all; but that is generally the reason they do it.   They might headguy a pole if it is weak.

"Q. Why were they headguying the pole that morning?
"A. I don't know the reason.   Because, I suppose, it swayed, and they were afraid they would pull it out of place or something to that effect. * * * The pole that broke was on a corner, and there would be more strain on it on that account.   The custom is to generally put a large pole, a good, sound one, on the corners.   This pole was not a safe pole for that purpose. The headguys are used on corner poles for the purpose of keeping them straight.   I do not think I was told why to headguy the pole.   John Ralph, the foreman, told me to headguy it.   They generally order all corner poles head-

guyed. It is customary to pull on the rope while men are up there working as I was, and it was being done in the usual way that morning."

I think the judgment should be affirmed.

McALVAY, MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred with BLAIR, J.