## VINCENT v. CLEMENTS.

1. Master and Servant — Personal Injuries — Appliances and Places to Work—Duty of Master.

   The duty to furnish a reasonably safe steam boiler in the first instance, involving the necessary inspection for that purpose, is a primary duty of employers, which cannot ordinarily be delegated so as to escape liability.

2. Same—Inspection—Plaintiff as Inspector.

   Where defendant employed an engineer, licensed under municipal authority as required by ordinance, who was present during the installation of a steam boiler and inspected the same during its installation, and assisted the public inspector at the original and successive inspections, defendant is not liable for the death of such engineer caused by the bursting of the mudpipe elbow of the boiler, owing either to an original defect or to corrosion, either of which would have been disclosed by proper inspection, defendant having no notice of any incompetency in deceased necessitating further inspection of the boiler for his protection.

Error to Wayne; Hosmer, J. Submitted November 12, 1907. (Docket No. 153.) Decided December 10, 1907.

Case by Nettie Vincent, administratrix of the estate of George Vincent, deceased, against Charles H. Clements and Edwin W. Smith, copartners as Clements & Smith, and Edwin F. Webster, Edward M. Harrigan, and William H. Reid, copartners as Webster, Harrigan & Reid, for negligently causing the death of plaintiff's intestate. There was judgment for plaintiff as against defendants Clements and Smith, and they bring error. Reversed.

*Clark, Jones & Bryant*, for appellants.

*Dohany & Dohany*, for appellee.

BLAIR, J. Plaintiff prosecutes this action as administratrix of her husband's estate to recover damages for his death, alleged to have been caused by the negligence of the defendants in failing to perform their duty—

" To furnish him a reasonably safe place in which to work; also to furnish him a boiler and engine reasonably safe and complete in all its parts, fixtures and appurtenances *and especially with a proper, suitable and perfect elbow of the mudpipe used in connection with the boiler and engine;* and to so construct, maintain and place said boiler and engine and all parts, fixtures and appurtenances *and especially said elbow of said mudpipe in* such a manner that the same would be properly and readily inspected by the proper officers or others having occasion or owing the duty to inspect the same," etc.

The boiler in question was installed by a reputable firm, under written contract with defendants Clements and Smith, who were the proprietors of the Metropole Hotel in Detroit, for use therein. The contract was dated January 4, 1901, and the work of installation was begun thereunder two or three days later. Plaintiff's intestate, George Vincent, a licensed, first-class engineer, was employed by defendants Clements and Smith to take charge of their engine room and boilers on January 9th. He was present, in the room, during practically the entire work of placing the boiler and attachments, had an opportunity to see what was done, to inspect the work and attachments, if he desired to, and did occasionally assist the contractors' workmen and make ocular inspections. Vincent continued in the employ of defendants from January 9, 1901, till the day of his death, January 29, 1904, except from September 20, 1901, to May 5, 1902, when he was elsewhere employed. The boiler which had been used prior to installing the new boiler " was left there. It was left there as an auxiliary boiler to relieve the new boiler when it was necessary to clean it and repair it and so forth." At the time this boiler was installed, a city ordinance provided for the appointment of an inspector, who was required to be—

"A man of skill and of at least ten years' experience in the operation of steam boilers, whose knowledge of the construction and operation of steam boilers will enable him to determine the requirements of safety to life and property under all the varying conditions under which they are operated, and enable him to intelligently fulfill the duties of his position.   *   *   *

"The inspector may appoint, subject to the approval of the common council, two assistant inspectors, who shall have at least five years' experience in the operation of steam boilers, competent to fulfill every requirement of this ordinance, and to exact proper compliance on the part of all persons interested."

Among the provisions of the ordinance are the following:

"SEC. 9. Every new boiler shall be inspected and approved in writing by the inspector before being put in use.   *   *   *

"SEC. 11. Inspection of every boiler in the city of Detroit must be made at least once a year, excepting boilers in private residences.   *   *   *   A complete record of each inspection shall be kept in books of record provided for the purpose, giving in detail the result of the inspection, including the kind of boilers, and kind and quantity of material, thickness of plates, dimensions of the boiler, particulars as to riveting, including size and space of the rivets, whether they are single, double or triple riveted, results of calculations made by the inspector as to the pressure allowable, condition of the setting, feed water apparatus, safety valves, safety water column and other equipment, age of the boiler, date of inspection, and any other particulars that the inspector may deem pertinent. A manifold copy of this record shall be supplied with the certificate of inspection.   *   *   *

"SEC. 14. All appliances provided for by this ordinance shall be kept in proper working order, and it shall be regarded as a misdemeanor for any owner, user or engineer to operate any boiler for a period not exceeding two weeks with any such appliance inoperative or out of repair. Such misdemeanor shall be punishable by a fine not exceeding one hundred dollars ($100), or imprisonment in the Detroit house of correction for a period not exceeding three months, or both, at the discretion of the court.

"SEC. 18. No person shall have charge of or operate a

steam boiler in the city of Detroit without a license. Whenever any person claiming to be qualified to operate a boiler shall apply in writing, on blanks provided for the purpose, for a license, the inspector shall examine him and consider the proof offered in support of his claims, and if, after full and careful examination, the inspector is satisfied that his knowledge and experience render him competent to handle boilers with safety to life and property, and that his character and habits are such as to cause the belief that he is a safe person to be entrusted with the responsibilities of such a position, he shall issue a license certificate to the effect, designating the class in which he is authorized to operate. * * * There shall be three grades of engineers' licenses. First class shall be unlimited as to the number of boilers and pressure, and shall be granted to any citizen having five years' experience in the care of steam boilers, providing he can pass a satisfactory examination. * * * Incompetency, intemperance, inattention to the duties of his position, absence from his post of duties without providing a competent substitute, failure to keep the boilers and all their equipment in his charge in good repair and proper working order, shall be regarded as sufficient cause for the withholding or revoking a license by the inspector.

"SEC. 21. If any person shall, on or after 30 days subsequent to the passing of this ordinance, operate any steam boiler in the city of Detroit without having complied with the requirements of this ordinance, or shall keep in use any boiler after receiving notice from the inspector that it is unsafe at greater pressure than the inspector may stipulate, or shall operate any boiler at a greater pressure than authorized, or shall employ any person without a license to operate any boiler within the city of Detroit, he or they shall be deemed guilty of a misdemeanor, and, upon conviction, shall be sentenced to pay a fine not exceeding $1,000 and to undergo imprisonment in the Detroit house of correction for a term not exceeding six months, and any person so offending shall be liable for all damages resulting directly or indirectly from such acts.

"SEC. 23. In making inspections the inspector shall apply the hammer test, and also, when deemed necessary by said inspector, of the hydrostatic pressure in the relation of 150 pounds to 100 pounds, as the working power allowed such steam boilers."

As shown by the inspection reports, copies of which were delivered to defendants, the boiler in question was inspected by assistant inspectors in February and April, 1901, and the condition of the boilers certified to be good, but it does not appear that the hammer test was used, as required by the ordinance, nor does it expressly appear that any inspection was made of the mudpipe elbow. The boiler was again inspected in February and April, 1902, during the interval when another engineer was in charge, and the condition of the boilers reported as good. On this occasion, the hammer test was used, but it does not appear specifically that there was any test of the mudpipe elbow. The boiler was also inspected in February, 1903, and the hammer test applied, but with no specific reference in the report to the mudpipe elbow. The boiler in question was designed for a mudpipe underneath, and about four feet from the back connected with the boiler by a flange and elbow called a mud elbow.

"A mudpipe on a boiler is usually used for two purposes. One is to answer the part of a feed pipe to supply the boiler with water through the mudpipe, and another is a settling basin for the mud in the boiler and when we clean out the boiler to wash it out."

On January 24, 1904, while the engineer was in the performance of his duties, the mud elbow burst and the consequent escaping steam so injured him that he died during the day. The evidence in behalf of the plaintiff tended to show that the mud elbow was unsafe and defective when connected with the boiler by the contractors; that its unsafe condition would have been discovered if the "hammer test," so called, had been employed by a competent inspector; that any other of the usual tests would not have been likely to disclose the particular defect which caused the explosion. Plaintiff's expert testified:

"*Q.* While this elbow was attached to the mudpipe and in regular service underneath the boiler, could the ordinary stationary engineer have ascertained the defective condi-

tion of this mud arm or elbow by means of what is known as the hammer test?

"*A.* The ordinary engineers as we have them, I think not.

"*Q.* As I understand you, the ear must be trained to the sound, is that the idea?

"*A.* Why it is necessary that it should be. If the ordinary engineer knew that that was defective and would go there to find the defect with the hammer, he could do it if he knew it. The average engineer's inspection of a boiler is a very crude affair.

"*Q.* Could you yourself have detected the defective condition of that elbow before it burst by means of the hammer test?

"*A.* Yes, sir.

"*Q.* While in service under the boiler?

"*A.* Yes, sir.

"*Q.* Could any inspector of trained ear have detected it?

"*A.* Yes, I think he could. * * *

"*Q.* It would take an ear especially trained for that purpose to detect the defect?

"*A.* It usually takes, yes, sir, a man accustomed to sound and sense of feel. * * *

"*Q.* Now, do you say it was customary before putting in any fitting of that kind to test it with the hammer test?

"*A.* It is."

Defendants' evidence tended to show that the bursting of the mud elbow was due to corrosion of the metal after it was in place and not to an original defect; that Vincent represented the defendants, Clements and Smith, and that they relied upon him to see that they got what their contract called for. The chief deputy boiler inspector for the city of Detroit testified, on behalf of defendants, that he made the inspection of the boiler in 1903:

"The date of the inspection was February 27, 1903.

"*Q.* And what kind of an inspection did you make that time?

"*A.* Well, we made a hammer test?

"*Q.* Did you inspect the mudpipe and mud drum?

"*A.* Yes, sir. We got in through the door. There was a door—an opening with an iron door on it on the

side.   We inspected the boiler, the external parts and the internal parts.   We inspected the mudpipe and elbow, examined it all around.   We applied the hammer test to it.

"Q. You, as boiler inspector, know what a thorough test is, do you not?

"A. Yes, sir.

"Q. State whether or not you made a thorough test.

"A. No; there was a part of the mudpipe we couldn't get at correctly.

"Q. What part of it?

"A. Part of the elbow and the forward part of the pipe.

"Q. Why not? ˙ *   *   *

"A. There was a brick wall built in front of it to protect it from the gases and the hot and cold air going through there, and the wall is built so a man could not get around that boiler or around the mudpipe, I should say—one side of it you can get at and the other side you could not.  *  *  *  I certainly gave it a hammer test in 1903, but about the wall, I can't tell.   They might have had a new wall—the old one got tore out.   I don't know what they had there, whether they tore it out or not.   I didn't make a hammer test on the mudpipe in 1902.   I made a hammer test on the mudpipe in 1903, as far as I could get to it, that is right.

"Q. Just a part of it?

"A. That is right.

"Q. And you so notified Clements & Smith in your notice, did you?

"A. I did not.

"Q. Well you turned in a report of that kind?

"A. I turned in a report, yes, sir.

"Q. And that report was that you tested only a portion of the elbow?

"A. Yes, sir.

"Q. Now, as a matter of fact, you never made any complete test of this elbow from the time it was installed, up until the time it blew up, did you?

"A. Not a complete, no, sir.

"Q. And you so reported to your boiler inspector?

"A. So reported.

"Q. That is to the chief boiler inspector?

"A. To the chief boiler inspector.  *  *  *  In 1903 I could not get at the mudpipe all around, but a written

report—I don't think I put in a book about that, but I let the chief engineer—the chief boiler inspector—know about it."

At the close of plaintiff's testimony and again at the conclusion of the testimony, defendants' counsel moved the court to direct a verdict for defendants. The court refused to direct a verdict for defendants and charged the jury, among other things, as follows:

"I think there has been evidence offered to you from the witness stand from which you may determine that the proximate cause of this accident is either one of two things—the insufficiency of the elbow in question by reason of the core having slipped in the casting, or, on the other hand, gentlemen of the jury, the weakening of that elbow by reason of the rust. Now it is for you to say in this case, what was the cause of it, was it from the insufficiency of this elbow from the slipping of the core in the casting, or was it, on the other hand, gentlemen of the jury, from the action of the heat and the elements upon the elbow after it was put in? * * *

"Now, you have heard the testimony in this case as to the employment of Mr. Vincent, and the question for your determination in this case is, for what was he employed at the time of the installation of this new boiler and the appliances and the attachments? If you believe in this case, gentlemen of the jury, that his employment at that time was simply and solely as an engineer, and that he did not at that time undertake the inspection of this machine, then I say to you, if you believe that there was negligence in the putting in of this elbow, and that the weakness—inherent weakness in the elbow, which should have been discovered on a proper inspection, was the proximate cause of this injury, then under those circumstances the plaintiff would be entitled to recover such damages as you will find have been sustained by reason of the death of Mr. Vincent.

"Now, what was Mr. Vincent's position there? Was he inspecting that job? Because if he was, gentlemen of the jury, and if he assumed, whether he was competent or not—if he assumed to perform that labor, then under those circumstances I do not think there can be a recovery in the case, and charge you that if you should find that he was acting as the inspector of that, for Clements

& Smith, then, gentlemen of the jury, he cannot recover.
* * *

"After it was once installed, whatever his duties may have been before, it is unquestionably his duty to make a sufficient inspection of the appliances to the boiler if it was reasonably fit in the first instance, then his duties as an engineer would require him to make an inspection of that engine—of the boiler and its appliances, and if, as I say, time and the elements has destroyed that which was reasonably fit in the first instance, then it is not the fault of the defendants in this case, because it became his duty, as a user of this machinery, to make the proper inspection, and if he himself, gentlemen of the jury, felt that he was not competent to make such inspection, if you should find it was reasonably proper in the first instance, it became his duty to so inform Messrs. Clements & Smith, and get a man who could properly inspect it.   * * *

" *Mr. Clark:* I think, if the court please, you should charge the jury that even if they should find that the elbow was defective originally and that the elements and the rust and corrosion contributed to that injury, that he could not recover, because manifestly, it was his duty to examine it afterwards and if the rust and corrosion contributed to it, why,—

" *The Court:* Well, I will say this, gentlemen, in that regard: Where there are contributing causes—where there is an intervening cause in this regard, if the intervening cause in general is an innocent cause, it is referable to the first; if it is not, why, of course, then it is referable to the second. In other words, gentlemen of the jury, if you find that time and the elements had a tendency to weaken that thing, then it becomes your duty to determine whether Mr. Vincent made a proper inspection or not, because if he was guilty of negligence and could have discovered this matter—should have discovered this matter, gentlemen of the jury, as an engineer—in other words, if he contributed by any negligence of his own to the matter, then, of course, gentlemen, there can be no recovery."

The jury rendered a verdict in favor of plaintiff, and defendants bring the record to this court for review. The points presented for our consideration by the brief of counsel for appellants are:

1. That the court erred in refusing to direct a verdict for defendants.

2. That the court erred in submitting to the jury for their determination whether Mr. Vincent represented defendants for the purpose of inspecting the boiler and attachments as they were being installed.

3. That the court erred in refusing to give defendants' 5th request, which was as follows:

"5. If you find that the explosion occurred by reason of the fact that the mudpipe was originally defective and also because it had been subjected to external corrosion, that is to say, if both causes contributed to the injury, then I charge you that your verdict in this case must be for the defendants."

We are of the opinion that the circuit court erred in refusing to direct a verdict for defendants. It is established by the decisions of this court, as contended by plaintiff's counsel, that the duty to furnish a reasonably safe boiler in the first instance, involving the necessary inspections for that purpose, is a primary duty of the employers, which cannot ordinarily be delegated so as to escape liability. *Morton* v. *Railroad Co.*, 81 Mich. 423; *McLean* v. *Railroad Co.*, 137 Mich. 482; *Livingway* v. *Railway Co.*, 145 Mich. 86.

This primary duty is modified, however, in the case before us by the requirements of the ordinance, the character of the services to be rendered by the engineer and the duties owing by him to the defendants. The defendants were not at liberty to commit to whomsoever they pleased the care and operation of their boiler but were limited in their choice to those whose qualifications for the position had been determined by the official boiler inspector of the city and who held his license certifying that they were "competent to handle boilers with safety to life and property." Mr. Vincent held such a licence as an engineer of the highest grade, and the defendants had a right to rely upon his possession of the qualifications of such an engineer. Among such qualifications were clearly the ability to determine by the usual and necessary tests the condition of the boiler and its attachments and equipment as to

safety.  There is nothing in the testimony to indicate that
he did not possess the necessary qualifications nor that
the defendants were chargeable with notice of any lack of
qualifications.   In the absence of evidence to the contrary,
Mr. Vincent must be presumed to have had the necessary
qualifications for his position, including the ability to prop-
erly inspect the boilers under his charge.

The ordinance required every new boiler to be inspected
before being put in use.   Such an inspection was had and,
as shown by the certificate of the official inspector, he was
"assisted in examination by engineer V."   During the
entire period of the installation of the boiler, Mr. Vincent
was in charge of the engine room and boilers and not only
had the opportunity but it was his duty to his employers
to see that the boiler as installed was in reasonably safe
condition.   Mr. Vincent had charge of and operated the
boiler for two years and a half under a constant obliga-
tion of vigilance as to its safety, and in February, 1903,
again assisted the official boiler inspector in making his
official inspection of the boiler.   While the official inspec-
tor testified that he did not make a thorough inspection
of the elbow in the mudpipe because prevented by the baf-
fle wall, there was nothing in the official certificate, a copy
of which was given to defendants, to indicate this.   The
certificate, like those of the preceding two years, testified
to defendants that the boiler was in good condition, not
only on the authority of the official inspector but of their
engineer, who assisted in making the examination.

If a thorough inspection was not made by the official
inspectors, it was the duty of the engineer to call their
attention to it, and, upon their failure to make the proper
inspection, to make it himself.   The proprietors of the
hotel purchased the boiler and equipment of a reputable
firm; they employed a competent engineer to take charge
of the boiler; before it was put in use by their engineer
it was examined by him and the official inspector for the
purpose of determining whether it was safe for such use;
the certificate informed the proprietors that the examina-

tion by the city official assisted by their engineer disclosed that the boiler was in safe condition for use. Only upon the theory that the engineer himself was known to be incompetent can it be urged that defendants owed him the duty of further inspection of the boiler for his protection. There is no evidence of such incompetence or notice thereof, and the presumption is to the contrary. The record discloses no evidence of any negligence on the part of the defendants in the discharge of their legal duties towards the plaintiff's intestate.

The judgment is reversed, and a new trial ordered.

McALVAY, C. J., and CARPENTER, GRANT, and MOORE, JJ., concurred.