ROBBINS *v.* TREBILCOCK.

MASTER AND SERVANT—DEATH—NEGLIGENCE—SAFE PLACE—OBVIOUS
DANGER.

> In an action for the death of plaintiff's decedent, who was
> killed by the falling upon him of an overhanging bank
> while he, was engaged in shoveling earth below, where
> defendants never assumed the duty of advising the men
> that it was not safe to work under an overhanging bank
> or that it was necessary to break down an overhang, and
> no assurance was given that the apparent condition of the
> bank was not the real condition, and the danger was too
> obvious to demand warning or inspection, defendants were
> not guilty of any negligence entitling plaintiff to recover.[1]
> *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236.

Error to Marquette; O'Brien, J., presiding. Sub-
mitted June 24, 1915.   (Docket No. 40.)   Decided
September 28, 1915.

Case by Winifred Robbins, administratrix of the
estate of William Robbins, deceased, against William
Trebilcock and another, copartners, doing business un-
der the name of Trebilcock Brothers, for the wrongful
death of plaintiff's decedent.   Judgment for plaintiff.
Defendants bring error.   Reversed and no new trial
granted.

*William P. Belden* and *Thomas Clancey,* for appel-
lants.

*Le Gendre & Driscoll,* for appellee.

OSTRANDER, J.   Defendants were constructing a con-
crete dam, in doing which they used earth and gravel
taken from an open pit in the immediate vicinity of

[1] On responsibility of master for safe place to work where con-
ditions are changing, see notes in 19 L. R. A. (N. S.) 340, 28
L. R. A. (N. S.) 1267.

the dam, which was loaded upon wagons and drawn by horses to the dam. They employed between 40 and 50 men, among them two teamsters and several gangs of shovelers. The pit was in level ground, was opened in a northerly and southerly direction, was entered at the south, and was about 50 feet wide and 100 feet long. The breast of the pit, against which the men were working, was on the east side, where, upon the particular occasion, and at the particular point of interest here, the wall was about 8 or 9 feet high. The soil was sod at the top, clay, sand, and gravel, the top crust frozen to a depth of 6 to 10 inches. To remove the earth the men used picks and shovels in the bank, undermining the top and permitting it to fall, did some blasting, drilling the holes for dynamite with a steel bar, by hand, and were obliged sometimes to go upon the top and break or bar down portions which did not fall. Working hours were from 7 o'clock in the morning until 5 o'clock in the evening; the time used being 45 minutes faster than standard time. Plaintiff's decedent, a sober, steady workman, 25 years old, was hired as a shoveler, and began work at 7 o'clock on the morning of December 2, 1911. He had previously worked in iron mines and in excavating earth for basements, or cellars, in Ishpeming. Working in the gang with him were three other shovelers. At some point in the east wall they began work after some discussion respecting the character of the bank, deciding to drill and blast it down. After firing the blast, they began loading the earth, and continued to do so until near quitting time at night, when a wagon was brought in for the last load. At the place they had been working the loose earth had been removed, and the teamster spotted the wagon at a point some 25 feet away, where considerable loose earth had dropped and was lying on the floor of the pit. At this point no work had been done for two days. There was an overhanging bank

there. The wagon was placed 6 or 8 feet from the bank and where it was from 8 to 9 feet high. Plaintiff's decedent was working between the rear end of the wagon and the bank, when the overhanging "chunk" of earth fell, pinning him against the wheel and fatally injuring him.

From this statement it would appear that the men, including plaintiff's decedent, were engaged in the most common labor in the face of a possible and obvious, but not probable, danger—a danger as well to be appreciated by one man as by another. But counsel for plaintiff in the brief and argument asserted two principal propositions from which the responsibility of the employers for the event is deduced. He contends: *First,* that the alleged dangerous situation was created before plaintiff's decedent's employment began; and, *second,* that the employers assumed and performed in the course of the work the duty of barring down overhanging banks. The last proposition stated involves in argument, if the duty existed, the duty to keep watch of the banks, to inspect the pit, to warn if the duty had not been performed. The duty of the employers to maintain a reasonably safe place for the men to work is, in short, the general duty asserted, and the jury was instructed that such a duty existed.

There is testimony supporting the conclusion that the employers were solicitous for the safety of the men working in the pit, cautioning them, commanding them, not to work under an overhanging bank, keeping a general oversight of the work. It does not appear that plaintiff's decedent heard any such commands or was himself warned of danger. There is the following testimony to which we are referred by the brief:

"It was the custom there for Trebilcock and Carlyon to do the inspecting. They were supposed to inspect the place before they sent men or allowed men to go in. That had been customary all the time I was there.

"*Q.* In other words, they made the men shovel dirt and keep at that and did the inspecting and watching the place?

"*A.* Yes; they had to keep their shovels going.

"*Q.* And the boss and Carlyon watched after the safety of the place?

"*A.* Of course, they had two or three places to watch besides this one. They would go around and watch the different places and keep the men working.

"*Q.* In other words, the men didn't inspect the place. Carlyon and Trebilcock inspected the place, and the men shoveled the dirt?

"*A.* Yes; that is the way it was always done."

It is the contention of defendants, appellants, *first*, that the testimony fails to establish—does not tend to establish—negligence of the defendants. There are other contentions, but the case must be disposed of upon this one. We find no testimony tending to prove failure of defendants to perform a duty owing to plaintiff's decedent; we find none supporting the proposition that defendants ever assumed, or performed, the duty of barring down the overhanging banks. On the contrary, the men uniformly did such work. Day by day the men working on the floor of this pit were digging into the bank, breaking it down, and putting the earth into wagons. If, after being undermined, the bank did not come down, it was picked or barred down. With seven or eight gangs of shovelers, four men in each, the work of breaking down the bank in some part of the pit must have been practically continuous. The testimony upon which plaintiff relied, and relies, must be read with the remainder of the testimony of the witness and other witnesses. So read, it is made entirely evident that while the employers overlooked the work, brought their experience and "safety first" ideas into operation, they never assumed, and the men never assumed, that it was a part of their duty to advise them that it was not safe to work under an overhanging bank, or that it was necessary to break

down an overhang which otherwise would not or did not fall. The work was too simple and such danger as existed was too obvious to demand warning or inspection as a duty.

The case at bar and *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236 (109 N. W. 431), cannot be distinguished by the fact that plaintiff's decedent had not done work at the particular place in the pit—was not one of the men who left the particular overhanging bank in position. All the men employed there were taking down the bank. The work was in all stages, from hour to hour and day to day. As the bank was left at night, so it might or might not be found upon beginning work in the morning. As men moved from point to point along the bank, they were necessarily confronted with the results of the last operation of fellow workmen, and perhaps also the results of the operation of the law of gravity. There was, in the nature of things, and could be, no guaranty that any particular set of men had left any particular part of the bank a safe place to work under or near. Plaintiff's decedent was not, in fact, relying upon the opinion or any undertaking of his employers.

For the reason that the case is, in principle, ruled by the one last above cited, it is unlike *Livingway* v. *Railway Co.*, 145 Mich. 86 (108 N. W. 662) ; *Druck* v. *Lime Co.*, 167 Mich. 154 (132 N. W. 492) ; *Lewis* v. *Brick Co.*, 164 Mich. 489 (129 N. W. 726) ; *Simone* v. *Kirk*, 173 N. Y. 7 (65 N. E. 739) ; and similar cases. No portion of the bank of this pit was expressly or impliedly tendered to plaintiff's decedent as permanent, or as safe, no such representations were made to him, no assurance was given by custom or otherwise that the apparent condition of the bank was or was not the real condition. The open pit, away from the walls, was safe. But if the defendants had neglected a duty to bar down the particular overhang of the

bank, the fact was apparent. There was the overhang —a slight one to be sure, but visible, and as ominous to plaintiff's decedent as to any one else. However slight the peril may have seemed to be, it was not removed or avoided. The result was most unfortunate, but cannot be attributed to defendants.

The judgment is reversed, and no reason appears for granting a new trial.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice McALVAY took no part in this decision.