(Opinion published 52 N. W. Rep. 136.)

---

### GUSTAF BERGQUIST *vs.* CHANDLER IRON CO.

Argued April 27, 1892. Decided May 16, 1892.

**Master and Servant—Negligence.**—Several alleged erroneous rulings of the court upon the trial of this action, which was for damages said to have been caused by defendant's negligence when operating an iron mine, considered and disposed of.

Appeal by defendant, the Chandler Iron Company, from an order of the District Court of St. Louis county, *Start,* J., made March 19, 1891, refusing its application for a new trial.

The plaintiff, Gustaf Bergquist, a Swede, was employed by defendant August 5, 1889, and set to work under ground in its iron mine at Ely, Minnesota. In this mine was a drift or tunnel running east and west, excavated before plaintiff was employed. He and his brother were set to work to excavate another drift or tunnel running from this one to the south at right angles, and on the same level with the other. At the point of junction was a well into which plaintiff and his brother poured the earth or ore they excavated, and it fell down to a lower drift, in which were a tramway and ore cars to take it out of the mine. This well is called by miners a "raise," as it is constructed by digging from the bottom drift upward. A plank lay across the top of this well or raise, to afford a passage over it for the miners. The plaintiff, on August 8, 1889, lay down on this plank to loosen the earth that had adhered to the sides of this well. While doing this a quantity of soapstone fell from the roof over the well, and broke his left

leg above the knee. He brought this suit to recover damages for this injury, claiming the stone fell from the roof of the drift or tunnel running east and west. He contended that defendant was negligent in not making the roof of that drift reasonably safe for workmen to pass under. The defendant claimed that the stone fell from the roof of the new drift dug by plaintiff and his brother, and because of their negligence. The principal question of fact in the case was, which of these contentions was true.

The action was tried January 5, 1891. The jury found for plaintiff, and assessed his damages at $4,437.67. Defendant moved to set it aside, and for a new trial, and, being refused, it appealed to this court.

*Draper, Davis & Hollister,* for appellant.

*John Jenswold,* for respondent.

COLLINS, J. This was an action brought to recover damages for an injury received by plaintiff through the negligence, it was alleged, of defendant corporation, engaged in iron mining. It had put into its mine an east and west drift 4 feet wide and 6 feet in height, about 15 feet above the tramway which ran from one main shaft to the other. From this tramway, which was timbered upon sides and roof, there had been opened upward to the drift a "raise" about five feet square, fitted at the bottom with a plank chute or spout, the lower end of which was one or two feet below the roof of the tramway. This raise was for the ordinary use of such openings. As the drifts are worked or extended, the ore, or "dirt," as it is always called, is shoveled or wheeled to the mouth of the raise, and dropped through it into the chute or spout below. A board at the lower end of the chute retains the dirt, but when pulled out by men called "trammers," who run the cars in the tramway, it drops down into them, and is conveyed to the main shafts for removal to the surface. As the dirt is moist, it frequently adheres to the sides of the chute; and it is the duty of the miners, at the end of their "shifts," or day's work, to clean down the sides of those they may have been using, and as the trammers place their cars underneath the chutes, and call for dirt, it is the business of the miners above to respond to the calls.

When the raise before mentioned was brought up, and broken through into the drift, it was partly on the south side, so that not more than half the necessary mouth or aperture was or could be in the floor proper of the drift; and, on the testimony, there was some question as to the condition of the wall at that point, and of the roof of the drift directly over the raise, and, as a consequence, as to the precise condition in which the aperture was left by the workmen. The plaintiff seems to claim that it was made full size across, by removing a part of the south wall of the drift, while defendant contends that the workmen did very little more than to break through the floor, and did not attempt to enlarge the aperture by removing any part of the wall above it.

Plaintiff and his brother had worked together for defendant about four days when the accident occurred; the former drilling, and the latter, more accustomed to mining, looking after the blasting. Two days before, they had been put at work at the point where the raise came into the east and west drift, with instructions to run another drift to the south, and had gone five or six feet, when, just as they were about quitting work for the day, the plaintiff, claiming that he heard the trammers below calling for dirt, crawled out on a plank which had been placed across the mouth of the raise, that he might be the better enabled to look down into the chute, and learn its condition. It is hardly necessary to say that the only light in the mine was that which came from candles carried by the miners, in hat or hand, and that only a very close examination would show the amount of dirt in the chute. While lying on the plank a quantity of the substance called "soapstone" fell from the roof just overhead, struck the plaintiff, and caused the injury—a fracture of the bones of the leg—of which he complains. The verdict was in his favor, and this appeal is from an order denying a new trial. The assignments of error, twenty-five (25) in number, several of which need not be mentioned, all go to the rulings of the court on the admissibility of testimony, and as to its charge to the jury.

1. The object of the testimony as to what was said by the trammers below, and as to what called plaintiff out on the plank, and why he went there, was proper and competent for the purpose of

showing that he was then engaged in the line of his employment, not out of his place while working, and merely attracted there by a simple curiosity to learn what was being said by the trammers below.

2. The question as to the practice and custom of timbering up in iron mines similar to that of defendant was competent and proper. When the inquiry is whether one has used ordinary care in a particular case, the degree of care required is that which men of ordinary prudence would usually exercise under like circumstances. *Kelly* v. *Southern Minn. Ry. Co.*, 28 Minn. 98, (9 N. W. Rep. 588.) The risk assumed by plaintiff when he entered defendant's employ as a miner was such as is incident to the performance of his work in the usual and ordinary way,—just such risks as usually and ordinarily surround mining operations. If, in mines similar to that worked by defendant, it was the practice and custom to timber up where there are bad places, the plaintiff had the right to believe that such practice and custom would be followed and observed by defendant corporation. The counsel are greatly in error when asserting, as they do in substance, that as a matter of law the plaintiff, when entering defendant's service, assumed the risk which attended the work as conducted in accordance with defendant's methods, not such risks as are usually and ordinarily incident to mining operations under like circumstances, and also such risks as he knew about, and may be said to have knowingly and voluntarily encountered.

3. The "shift boss," Wicks, a witness for defendant, was called upon to state his opportunities and his manner of observing the condition overhead, as he went about the mine. His testimony was that he made no examination unless he noticed that something had fallen as he walked about. Then he put up his candle and looked, presumably to see whether there was danger to be apprehended in the future. He was then asked "whether that was a sufficient precaution in your experience in that mine." An affirmative answer to this question was stricken out, on plaintiff's motion, and this ruling of the court is alleged to have been erroneous. The counsel now urge that, by means of this ruling, competent expert testimony as to what

was "the usual and customary test of safety" was withdrawn from the consideration of the jury. We fail to see how the question and answer tended to show what was the usual and customary test of safety, there or elsewhere; for the witness, when answering, simply gave his opinion, based upon his experience in that mine alone, as to what was a sufficient precaution. It had been made to appear by his previous testimony as to what was done that no precautions were taken to prevent the falling of material from the tops of the drifts until the fact that it had already dropped was casually discovered. Again, if this was intended as expert testimony upon the question of defendant's negligence, it is settled that whether this or that act of a plaintiff or defendant was negligence, and whether due care required this or that to be done, are not matters for expert testimony. They are matters of judgment and common experience, to be determined by the jurors upon the facts and circumstances of the case.

4. Upon the part of the plaintiff, it was contended that the evidence was sufficient to establish his claim that soapstone, when found with the ore, is an exceedingly dangerous substance, very liable to fall from overhead if not removed, and that the probability of its falling becomes much greater by exposure to the air, and that, when uncovered by the workmen as they open the drifts, it should be removed, or timbered up, if in the roofs, so that it will not drop down. The negligence complained of was in allowing this mass which fell to remain wholly unnoticed for about three weeks before the accident, when, on opening the east and west drift, it should have been removed, or something done to prevent its falling upon those who might have occasion to work or pass underneath it. We have referred to the dispute as to the manner in which the raise was left by those who made it, and whether its south wall was carried on up to the top of the drift, or left it about as it was when brought through into the floor. The defendant claimed that the south wall of the east and west drift was not interfered with until plaintiff and his brother commenced their work, and that, as they ran the drift to the south, they removed the material above the south half of the raise to the proper height, and were therefore responsible for a failure to remove the soapstone above. The plain-

tiff insisted to the contrary, and there was controversy, also, as to the place from which the soapstone fell. Witnesses for defendant testified that nearly all of it fell from the top of the new south drift, while plaintiff and his witnesses located its original position as in the top of the old east and west drift. So that there was an issue of fact as to whether the dangerous material fell from that part of the top which had been finished up by the men who ran a drift east and west, or from the top of the drift made by plaintiff and his brother. Defendant's counsel call attention in their brief to this conflict of testimony, and state that not only did the court charge the jury that plaintiff and his brother had nothing to do with working on or completing the drift and its roof, over the raise, but that prominence was given to this erroneous statement, and that when attention was called to it the court refused to make any correction. The error on this point is with the counsel, not with the court. No such statement as to the testimony was made, nor did the counsel so understand when taking their exceptions, or when preparing their assignments of error. The court did charge that the plaintiff had nothing to do with making the roof of the east and west drift, and therefore had nothing to do with making safe or timbering up any part of its roof. To this counsel excepted. This drift was made and the raise broken through into it several days, at least, before plaintiff and his brother were employed by defendant, so that in this respect the charge was strictly true; and, from other parts of the same, it is evident that there could have been no misunderstanding on the part of the jury as to what part of the roof over the raise the court was referring to.

5. The charge in this case, taken as a whole, was clear and explicit, and it was a full and accurate exposition of the rules of law, well settled in this state, which govern in actions of this character. The general duty of the master to the servant, which is to be performed in person or through others, and the extent and nature of this duty, was stated in the language so often used in the opinions of this court, and needs no repetition. And the court went fully into the matter of assumption of risks by the servant, and the degree of diligence, foresight, and care which the law imposes upon him. All the facts,

and the law bearing thereon, were fully and fairly presented, and we see no reason for interfering with the verdict.

Order affirmed.

(Opinion published 52 N. W. Rep. 136.)