KRIMMEL *v.* EDISON ILLUMINATING CO.

MASTER AND SERVANT — SAFE PLACE TO WORK — DUTY TO INSPECT.

> Where an experienced lineman, whose duty it was to inspect poles before ascending them, is killed by the falling of a rotten pole, and the company did not know of the defect, and had no reason to suppose there was any, and there is no evidence of a more practical system of inspection than the one it was his duty to make, the rule as to a safe place to work does not apply, and the lineman assumed the risk by his contract of employment.

Error to Wayne; Carpenter, J. Submitted April 25, 1902. (Docket No. 120.) Decided May 19, 1902.

Case by John Krimmel, administrator of the estate of Henry Krimmel, deceased, against the Edison Illuminating Company, for the alleged negligent killing of plaintiff's intestate. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*Edward H. Kennedy*, for appellant.

*Keena & Lightner*, for appellee.

MOORE, J. Henry Krimmel was a lineman in the employ of defendant. June 30, 1899, a pole upon which he was at work broke, and he received injuries from which he afterwards died. This suit is brought to recover damages for his death. The trial judge directed a verdict in favor of defendant. The case is brought here by writ of error. The only question involved is whether the case should have been submitted to a jury.

The record discloses that plaintiff's intestate was nearly 21 years of age, and had been in the employ of defendant nearly 4 years. The last year his work was that of lineman. Prior to October, 1895, the Peninsular Company, which company the defendant succeeds, had its wires upon a cedar pole near the corner of State street and Woodward avenue. A street railway was constructed in State street, and the street, between curb and curb, had been widened. The railway company strung its wires upon hollow, wrought-iron poles, about 22 feet high, and about 6 inches in diameter. When the street was widened, the cedar pole would not be near the curb; and, to get rid of some of the poles, the board of public works required the electric-light companies and the street-railway companies to join in the use of poles at certain locations, one of which was near State street and Woodward avenue. In order to carry the electric wires safely across Woodward avenue, it was necessary to make the pole

higher, so that these wires should not come in contact with the trolley wires.

In October, 1895, the foreman of the Peninsular Company went to Vinton & Co., and selected seasoned oak, which that firm had in stock, for about two dozen extensions of poles. The oak poles were turned at the bottom to a size that would enable them to fit snugly in the inside of the wrought-iron poles, with a shoulder upon them that rested on the top of the wrought-iron poles, and projected beyond the shell of the iron, which projection, it was expected, would keep out all water from the joint so made. The pole was then painted black. The pole in question was extended 9 feet 11 inches above the wrought-iron pole, and toward its upper end carried two crosspieces, which, in turn, carried wires.

Upon the day of the accident, Mr. Krimmel ascended the pole, had thrown one leg over the cross-piece, and was proceeding with his work, when the wooden part of the pole broke just below the top of the wrought-iron portion of the pole, and he was precipitated to the pavement below. When the pole was examined after the accident, it was found to be affected with dry rot. No inspection of these poles had been made previous to the accident, except what had been made by the linemen in the course of their work. The testimony is that it was part of the duty of the linemen to inspect the poles and wires, and if the defect is such that, with the material they have at hand, they can fix it, it is their duty to do so, and, if they cannot fix it, to report the defect to the office. The testimony is that no defect in this pole was ever reported, and the company had no knowledge of any defect in this pole until the time of the accident. It was also in testimony that the practical way to inspect the pole, and determine whether it was safe or not, was for the lineman, before leaving the iron portion of the pole, to reach up and shake the wooden portion of the pole, and that by so doing he could tell whether it was safe for him to go upon the pole; that the only other way to make an inspection was to lift the wooden portion

out of the iron post, which was a very troublesome thing to do, on account of the wires being attached to the pole; that, after the accident, an inspection of this character was made of the other poles, and none of them were found to be defective, and no other accident of this kind had ever occurred. It was not shown by any of the witnesses that Mr. Krimmel, after reaching the top of the iron post, made any test of this pole before going up the wooden portion of it.

It is insisted by counsel for plaintiff that the master must provide the servant with a reasonably safe place to work, and must keep it in a reasonably safe condition, and must, from time to time, make an adequate inspection, and that he cannot escape responsibility by delegating the duty of inspection to an employé, and that as defendant made no inspection, and the pole was decayed, the defendant was liable; citing *Van Dusen* v. *Letellier*, 78 Mich. 492 (44 N. W. 572); *Ouellette* v. *Alkali Co.*, 129 Mich. 484 (89 N. W. 436); *Essex County Electric Co.* v. *Kelly*, 60 N. J. Law, 306 (37 Atl. 619); and *San Antonio Edison Co.* v. *Dixon*, 17 Tex. Civ. App. 320 (42 S. W. 1009). The rule as to the duty of the employer is well settled, but the trouble comes in the application of the rule in a given case. In none of the cases cited by counsel was it shown, as in this case, that it was the custom of the company to have the inspection made by the person injured, before he entered upon his work, and that it was part of his duties to make the inspection. In the case of *San Antonio Edison Co.* v. *Dixon, supra*, it was found as a fact by the trial judge that by the exercise of ordinary care, and by testing the pole in the ordinary way, the company could have learned of the defect. In *Essex County Electric Co.* v. *Kelly, supra*, it was not shown there was any duty of inspection upon the part of the employé, and there was evidence to show that a proper inspection would have disclosed the defect which caused the injury.

The circuit judge was of the opinion:

"There was no testimony that the defendant knew of this defect. Its opportunity for knowledge was no greater than that of Krimmel himself. Krimmel had been a lineman for a year, as I understand. He had been employed in training for that service for two or three years longer. He was just as well acquainted, and probably more so, with the appearance of this pole, than the Edison Company. In other words, this defect was just as much unknown to the Edison Company, who had been in possession of the pole only a year, as it was to Krimmel; so that the question is whether he could say that the Edison Company should have known of this defect,—a defect of which both he and they were ignorant. That depends upon whether he was in a position to say that the Edison Company should have made an inspection, and satisfied themselves this pole was all right, and whether he had a right to say, 'I could rely upon your having made an inspection, and I was not obliged to take the chances of that hidden defect myself.'

"Such a rule is applicable in a great many classes of cases, but the question is whether it is applicable here. I do not think it is. You will remember that this post which was defective, and which fell, was in the top of an iron pole, 22 feet from the ground. It is obvious that there could be no effective inspection from the ground. It is obvious that there could be no inspection without some one climbing that iron post at least 22 feet. That is obvious to you, and it must have been obvious to Krimmel. Krimmel knew, then, that the only inspection that could be made would be made by climbing it; and who were the ones that would make that inspection, if it were made? Manifestly, no one but the linemen themselves. Now, of course, if they had been seeking to devise a system of inspection, they would have said, 'Well, we will go out today and inspect these posts, and send men out for no other purpose than the making of an inspection.' In that case, of course, while acting as inspectors they would be taking just such risks as inspectors would take. Another way would be to say that 'inspection will be made when you do your work.' We are not shown just how often these men had occasion to climb these poles. Manifestly, it was not a matter of everyday occurrence. They went up there when they had to do something with the wires. Now, what they did do in this case, not so much by express

notice, but by custom,—and by custom, too, which, it seems to me, Krimmel was bound to know,—was to say, in effect, that 'inspection will be made when you do your work.' I do not see how Krimmel could have lost sight of this. I don't think he did. So that Krimmel, it seems to me, was by this custom—a custom of the day's business, of which he must have known—charged with the duty of making the inspection himself. He knew that before he climbed the pole no one went up before him to inspect for him and report. He must have known that he never had known of any such inspection, because none had ever been made. So that it seems to me he must have known that that duty was not imposed upon any other official, but rested upon himself. In other words, he was charged with a duty of making an inspection by the circumstances of the case, and by the custom in vogue in the business of the company. That being the case, it seems to me it disposes of everything here. No matter whether that custom was a good custom or a bad custom, it was a custom known to him, and assented to, under the law, by him, and by remaining in the employment."

In *Flood* v. *Telegraph Co.*, 131 N. Y. 603 (30 N. E. 196), it is said:

"He [the intestate] knew precisely how the defendant inspected its poles, and the arms on them, and that it was not its custom to cause the arms on the poles to be inspected by some one climbing up the poles; and hence, as to him, carelessness in not inspecting the arms cannot be attributed to it. He knew that no one knew the condition of the arm which broke better than he did; and no one, in fact, knew better than he its sufficiency to bear his weight. If he gave the matter a thought, he knew that he must rely upon his own judgment in placing his weight upon the arm; but, before placing his weight thereon, he ought to inspect it, and see if it was sound, and strong enough to hold him, and he had no right to rely upon the judgment or inspection of any other person. Under such circumstances, it is impossible to perceive how the death of the intestate can be charged to the defendant."

The case of *Roberts* v. *Telephone Co.*, 166 Mo. 370 (66 S. W. 155), was one where the plaintiff, a lineman in defendant's employ, fell by reason of the breaking of a cross-arm upon which he worked in the line of his employment.

The linemen were expected to make any inspection of the poles, cross-arms, etc., which was had; and it was held that, under such facts, the rule as to safe place to work did not apply. The court quotes at length from the *Flood Case*, and cites other decisions. After showing that the linemen were expected to look after the poles, and that they knew that no other inspection of them was had, the court said:

"This case is clearly distinguishable from the cases cited and relied on by the plaintiff, in this: That in those cases the servant injured was not charged with the duty of ascertaining and repairing the defects in the appliances, but was using appliances furnished him by the master for use in the ordinary course of his employment, while in this case the plaintiff was charged with the duty and engaged in the work of inspecting and repairing the master's appliances. The plaintiff therefore assumed, by his contract of employment, all the risks incident to the performance of the work upon which he was engaged. The accident was caused by one of those risks. The plaintiff therefore has no claim against the defendant."

See, also, *Bergin* v. *Telephone Co.*, 70 Conn. 54 (38 Atl. 888, 39 L. R. A. 192); *McIsaac* v. *Lighting Co.*, 172 Mass. 89 (51 N. E. 524, 70 Am. St. Rep. 244); *Brennan* v. *Railroad Co.*, 93 Mich. 156 (53 N. W. 358).

In this case it is not shown that any system of inspection was more practical than the one it was the duty of the deceased himself to make. It is not shown the situation was such that defendant had any reason to suppose there was any defect in the pole, nor that anything it could do would make apparent to it what would not be apparent to deceased, had he done what it was his duty to do.

Judgment is affirmed.

Hooker, C. J., Grant and Montgomery, JJ., concurred. Long, J., did not sit.