[No. 9819. Department One. April 8, 1912.]

CLYDE H. HORD, *Respondent*, v. PACIFIC TELEPHONE AND TELEGRAPH COMPANY, *Appellant*.[1]

MASTER AND SERVANT—INJURY TO SERVANT—TELEPHONE POLES— DUTY OF INSPECTION—ASSUMPTION OF RISKS. The climbing of telephone poles by an experienced climber using spikes is not so inherently dangerous as to require separate superintendence or inspection, and does not relieve the servant of the assumption of the risks of a fall by reason of a defective spot in a pole otherwise sound and normal, where the only usual and customary inspection of poles was such as would be made by the climber himself in ascending the pole; and the servant assumes the risk as a matter of law.

[1]Reported in 122 Pac. 598.

Same—Safe Place to Work—Res Ipsa Loquitur. In such a case, the doctrines of safe place to work and *res ipsa loquitur* have no application.

Appeal from a judgment of the superior court for Spokane county, Hinkle, J., entered April 15, 1911, upon the verdict of a jury rendered in favor of the plaintiff, for injuries sustained by an employee in a fall from a telephone pole. Reversed.

*Post, Avery & Higgins,* for appellant.

*Dan Danielson* (*Heber McHugh,* of counsel), for respondent.

Chadwick, J.—Plaintiff entered the employ of the defendant in 1905, as a common·laborer. Thereafter he became an installer's helper, and after two or three months, was promoted to the position of installer, in which capacity he worked for the greater part of the time until April 1, 1910. The duty of an installer is to put telephones in residences or places of business, and to connect them up. In the prosecution of this work, the installer has to climb the poles carrying the service wires. On the day mentioned plaintiff was engaged in putting in a telephone, and fell from a pole a distance of some twenty-five feet, receiving the injuries of which he now complains. The customary way of climbing is thus described by plaintiff:

"A. Well, in climbing a pole the first thing to do is to— if the pole has not steps in it or hand holds on it—or steps, to buckle on a pair of spurs or climbers and to go to the pole and push against the pole to see if it is solid in the ground and to make a casual examination of the pole to see if there is any power wires on it. Q. Give the operation of getting up. A. And then in climbing the pole we put one foot—stick our feet on the pole like that (indicating) with the spurs and one foot above the other and a little to the side and take short steps and our hands are at the back of the pole going up like that (indicating)—body bowed out away from the pole."

Further light is thrown upon the manner of climbing, as well as the acts of plaintiff in this case, by reference to his testimony:

"Q. And you say what you did first was to look over the pole? A. I just pushed the pole and looked up the pole. Q. Just took the pole and pushed it? A. To see if it was sound in the ground. Q. It seemed sound in the ground, did it? A. Yes, sir. . . . Q. That was what you always did when you approached a pole, wasn't it? A. Yes, sir. . . . Q. The pole looked all right to you, did it? A. Yes, sir. Q. And from the inspection you made of the pole, it seemed all right? A. Yes, sir. Q. There didn't seem to be any place there that a spur would slip out of? A. No, not by just looking at it. Q. How hard did you put your spurs in? A. Well, I don't know as I could state that. . . . Q. And didn't you look at the side of the pole that you were going to put your spurs into? A. Yes, that is the side I looked up. Q. For the purpose of seeing whether it was all safe and sound? A. I looked up it to see if it was sound, yes, as far as I could see it. Q. You always do that, do you not? A. Yes. Q. And your purpose is to see whether your spurs will stick or not, is that true? A. To see if the pole is sound, yes. Q. For the purpose of seeing whether your spurs will stick or not? A. I think I have answered that question. Q. Is it a fact? A. Yes, that is the reason; to see if it is sound, yes. Q. I asked you if it was to see whether your spurs would stick or not? A. Yes, sir. Q. And you always do that when you are climbing poles? A. Yes, sir. Q. All men do, don't they—pole climbers? A. I don't know. I suppose so. Q. You suppose they do? A. I suppose they do. I don't know. Q. That is naturally the custom of any one climbing poles of that kind? A. That has been my custom. I don't know what it is with other people."

Negligence on the part of the defendant is alleged in that:

"It was the duty of the defendant company to furnish plaintiff a safe place to work in this, and that it was the duty of the defendant to furnish plaintiff safe and sound and secure poles for climbing and to keep them in that state while plaintiff was engaged in climbing same for the purpose of installing telephones as aforesaid. That it was no part of the duty of plaintiff to inspect the poles, there being

a special inspector employed for that purpose and plaintiff at no time inspected the poles, but used the same as furnished by the said defendant company in the proper discharge of his duties."

And in anticipation of the defense of contributory negligence, it is alleged that plaintiff was entirely ignorant of the nature and character of the pole he was about to ascend, and did not discover the exact condition by the inspection he made at that time, because a hard rain had fallen on that day, and in consequence thereof, the pole had assumed a darker color, thus concealing the spot which is alleged to have been rotten and out of which his spur slipped. Before coming to the law of the case, it is important that plaintiff's opportunity for observation be further referred to. He says:

"Q. And as you go up the pole, the side of the pole that your spurs is going into continuously passes before you, and before the spurs go into it, goes before your face? A. Yes, it is in front of me, yes. Q. Well, you are looking at it all the time, aren't you? A. Well, a person is looking more where he puts his hands. Q. You mean to say you are looking more where you put your hands? A. Yes. Q. Do you mean to say that a lineman, a pole climber, looks more to where he puts his hands than where he puts his feet? A. Yes, certainly. Q. You said— A. Well, because you place your hands up on the pole and you have got to see where you put them. Q. Do you want to tell this jury and this court that a man looks more to where he places his hands than where you put your spurs? A. It is of more importance because you put your spurs in by force; you don't put them in by looking. Q. You say you don't pay any attention to where you put your spurs when going up a pole? A. Some, yes. Q. How much attention do you pay to it? A. Well, as far as I am concerned—we climb poles hand over hand, and as I climb up I see my hands and I occasionally see my spurs, but I don't look—always look to the spurs. Q. What is the fact, do you attempt to watch where you put your spurs in? A. Not every step. Q. Well, do you generally, what is the custom with you? A. Well, the custom is as you climb a pole to look up and also to look down too. Q. Then you look both up and down? A. Yes, sir. . . . Q. Now,

I want to see if we understand each other; you say that in climbing up this pole you never paid any attention to whether the pole was defective or decayed or rotten or imperfect from a safety point; is that so? A. Just a casual glance as any cautious man would. Q. What? A. As any cautious man would make. . . . Q. Then you paid no attention to the fact that the pole might have become old and deteriorated? A. Only just as I could see from a casual glance. Q. Then you did pay some attention? A. Just a casual glance."

In line with this, is the testimony of one of defendant's witnesses, a professional pole climber, who examined the pole and who says:

"A. I climbed the pole; went up it. Q. In what way did you test the pole, if you did test it? A. Well, in every way, as all linemen will. In going up the pole you use your hooks— Q. You mean spurs, do you? A. Spurs, I should say—there is some that have hooks on them and you use them, and as you go up you can tell as you go up by looking, you always look where you are putting your spurs as a general rule and if there is any decayed places or season checks you will see them, and any other unsoundness—you can feel them if you don't see them. And if you don't see them you can feel the check with your hook and sometimes in—you drag the hook up—don't lift it up but jab it in the pole. Q. How is that? A. You don't lift the hook but jab it in there you see. Q. You don't lift it up? A. Scrape it up the pole, and if there is any defect of any kind you can feel it."

Plaintiff does not show any practice or custom of inspection. The only testimony approximating evidence is his assertion that one Claus Lewis was an inspector and that he had seen him inspect poles; but when tested by cross-examination, he does not seriously contend that it was the duty of Lewis to inspect poles before the lineman or installer climbed them. He says:

"A. Well, I had seen him [Lewis] out looking for poles. Q. You don't know that he was an inspector of poles or had that title, do you? He was just a foreman wasn't he? A. Well, he has charge of the men that took out the old poles

and put in the new poles. Q. But he is not an inspector any more than any foreman who takes out old poles and puts in new poles, is he? A. I don't know as to that. Q. What is that? A. I don't know, only what I have heard around the place—that it was considered that was his work. Q. I am just asking what the fact is about it. A. I don't know. Q. You don't know anything about it, do you—except as to his being foreman of the pole gang? A. He was foreman of the pole gang and instructed about where these new poles were to go. Q. And instructed them where he wanted the poles to be removed, that is true, isn't it? A. I think so."

Aside from the fact that plaintiff's own testimony fairly shows a duty of inspection on the part of a lineman or installer, he says, also, that this is the only defective pole he had found in his experience as an installer. When pressed to explain what under his theory would be a competent inspection, he testifies as follows:

"Q. How could you inspect a pole above the ground—by a man who would walk all around it like a woodpecker? A. I don't know. I never was instructed in that line. Q. You don't see how a man could inspect a pole above the ground? A. Why, yes. Q. What? A. Yes, I do. I think that he could climb a pole and cut into it or bore into it. Q. Bore into it? A. Yes, sir. Q. Did you ever hear of them going up a pole and boring into it in the way of an inspection trip? A. I never heard of it, no. Q. Never heard of any such thing? A. No. Q. They would have to bore into it every inch or two, wouldn't they? A. I don't know as to that. I don't know anything about inspecting poles."

The evidence fairly shows that, aside from the spot alleged to be defective, the pole was "normal." It was thoroughly examined by one witness, and although the evidence seemingly preponderates in favor of the soundness of the pole, the verdict compels us to accept plaintiff's version that, "Q. Then this was the only spot that you know of that was rotten in this pole, wasn't it? A. Yes, sir." The case went to the jury after the usual motions, and a verdict in favor of plaintiff was returned. From it, defendant has appealed.

The testimony shows, beyond peradventure, that plaintiff was an experienced pole climber; that the usual and customary manner of inspection was such as respondent made; that no inspector was employed for the purpose of testing poles before they were climbed by linemen or installers, and that, barring the spot found to be defective, the pole was in good condition. Therefore, unless the law is that the work was so inherently dangerous as to require separate superintendence or inspection, respondent cannot recover. The duty of superintendence or inspection by the master depends upon the character of the work. In the first instance, the doctrine is usually applied where more than one is employed and the work proceeds by concert of action and in obedience to signals, or where the character of the instrumentality is such or the employment is of such character as to warrant the assumption that the master would have discovered and warned the servant of defects which are not necessarily apparent to a man of ordinary prudence. Pole climbing has never been held by this court, nor by any other, so far as we are informed, to be in itself so inherently dangerous as to relieve the servant of the risks of his employment or the consequences of his act, where he might, by the exercise of the same methods which in reason the master would have used, have known of the defect. The charge of negligence in *Goddard v. Interstate Tel. Co.*, 56 Wash. 536, 106 Pac. 188, was identical with the charge in this case, and the testimony . was practically the same. The plaintiff's testimony failed to show a custom of inspection, and the testimony of the defendant that the climbers made their own inspection was positive. The proof of either duty or lack of inspection failed in that case as in this. The court said:

"This is not the case where there is an absolute duty of inspection delegated by the master to a special agent who, by reason of his skill, is better calculated to notice defects than the servant who is ignorant of conditions and has a right to rely implicitly upon a proper inspection by the master or

his agent.   The testimony of Charles McNeil, the local manager, was to the effect that there was no special inspector, and that it was understood by the linemen, the trouble men, and every one connected with the operation of the line, that it was their duty to notice the condition of the construction, and if there was anything wrong, to either correct it or repair it; . . . This testimony is not really controverted by the respondent; for while he would not say that it was his duty to inspect, his testimony as a whole showed that it was, and could not be reasonably interpreted in any other way."

The rule is well stated in *Anderson v. Inland Tel. etc. Co.*, 19 Wash. 575, 53 Pac. 657, 41 L. R. A. 410:

"And so in this case it was the linemen, and the linemen only, who were in the habit of climbing these poles; and under the undisputed testimony, there being no one else to inspect them, it was the duty of the linemen, before taking hold of the wire which might become dangerously charged with electricity, to test the same.   So well understood are the general duties of a lineman, and the opportunities which he has for examining the poles and the instruments with which he works, that it was held in *McGorty v. Southern New England Telephone Co.*, 69 Conn. 635 (38 Atl. 359, 61 Am. St. Rep. 62), that a lineman in the employ of the telephone company could not recover for an injury caused by a fall of a pole upon which he was at work, notwithstanding a prior statement by the foreman that he had been up the pole, and that it was safe, where plaintiff knew that it was the rule and custom for each lineman to test the pole for himself, and that suitable appliances were at hand for making such test, and for securing the pole in case the lineman doubted its safety."

More concrete statements of the law are to be found in *Krimmel v. Edison Illuminating Co.*, 130 Mich. 613, 90 N. W. 336, where a recovery was denied, the court saying:

"He knew that before he climbed the pole no one went up before him to inspect for him and report.   He must have known that he never had known of any such inspection, because none had ever been made.   So that it seems to me he must have known that that duty was not imposed upon any other official, but rested upon himself.   In other words, he was charged with a duty of making an inspection by the

circumstances of the case, and by the custom in vogue in the business of the company. That being the case, it seems to me it disposes of everything here. No matter whether that custom was a good custom or a bad custom, it was a custom known to him, and assented to, under the law, by him, and by remaining in the employment."

In *Sias v. Consolidated Lighting Co.*, 73 Vt. 35, 50 Atl. 554, it is said:

"It [the duty of inspection] is auxiliary to the lineman's principal work, can be conveniently made in connection with it, and requires no separate training. It is difficult to conceive of any preliminary work that would be more clearly in the line of the servant's duty. It could hardly be required that a company sending out a gang of men to repair its line should send other men before them to inspect the poles, and determine which could safely be climbed without the taking of precautions."

See, also, Jones, Telegraph and Telephone Companies, § 198; *Peoria General Elec. Co. v. Gallagher*, 68 Ill. App. 248; *Britton v. Central Union Tel. Co.*, 131 Fed. 844. Respondent seeks to distinguish these cases, especially the *Anderson* case; but in all the cases decided by this court in which reference to the *Anderson* case is made its authority is not denied, but admitted if the testimony showed that custom, duty, or the nature of the work put the burden of looking out for his own safety on the employee.

It is also insisted that respondent should recover, by reference to the doctrine of a safe place to work, and *res ipsa loquitur*. Our scaffolding cases, *Cleary v. General Contracting Co.*, 53 Wash. 254, 101 Pac. 888; *Leidke v. Moran Bros. Co.*, 43 Wash. 428, 86 Pac. 646, 117 Am. St. 1058; *Cheatham v. Hogan*, 50 Wash. 465, 97 Pac. 499, 22 L. R. A. (N. S.) 451, are relied on, but these cases are clearly distinguishable from the case at bar. In the cases in which recoveries have been allowed, the scaffold had been made by others, and it has been justly held that the workman had a right to go upon it without inspection. Here the duty of inspection goes

with the work. Respondent was experienced and knew the hazards of his employment. The distinction between an experienced workman. working upon or with a completed structure, and one who, by lack of experience or opportunity, cannot safeguard himself from danger, is obvious.

Respondent cites many cases to sustain his contention that his case is one for the jury, but all of them are to be resolved by their own facts. Either the employee was inexperienced, the custom of independent inspection was shown, or the defect was such that the cases were brought within the rule of latent or hidden defects not readily discoverable by the servant in the performance of the particular service put upon him; as, for instance, a break at or below the surface of the ground. It seems to us that, to hold appellant to the duty of an independent inspection that would make it liable in damages for failing to find a single defective spot in a pole otherwise sound and normal as the witnesses described it, considering respondent's experience and opportunity to discover the defect, and a total failure of proof on the charge that appellant made independent inspection, and in the light of the fact that the work while not classed as inherently dangerous is of such a character as to require care and caution, or in the words of a witness "it becomes second nature for a man to inspect," would be to put upon appellant the obligations of an insurer. No cases have been cited which carry the law to this extreme, nor have we found any.

The judgment of the court below is reversed, and this cause will be remanded with instructions to sustain the motion of appellant for judgment of dismissal.

DUNBAR, C. J., GOSE, CROW, and PARKER, JJ., concur.