CHARLES I. HULSE, Respondent, v. HOME TELEPHONE COMPANY, Appellant.

Kansas City Court of Appeals, May 13, 1912.

1. TELEPHONE: Linemen: Master and Servant. The relation between telephone companies and their linemen is no different from the ordinary relation between other masters and servants in the same or like situation and circumstances. The rule in some other states not followed in this state.

2. TELEPHONE POLES: Dead Wires: Inspection: Foreman. Where a lineman of experience, in the employ of a telephone

company, knows that his foreman has not inspected a pole,. and that separate inspectors are not kept by the company, and is directed by the foreman to go alone to another pole. while the foreman climbs one by which they are standing, it becomes his duty to inspect the pole for himself. And if on climbing it and cutting out "dead wire," it falls by reason of being rotten at the ground on the inside, though looking fair on the outside, he cannot hold the company liable for his. injury.

Appeal from Buchanan Circuit Court.—*Hon. W. K.. Amick,* Judge.

Reversed.

*Wm. E. Stringfellow* for appellant.

*Jno. D. McNeely* and *B. J. Casteel* for respondent..

ELLISON, J.—Plaintiff was what is known as a "line man" in the defendant telephone company's. employ in the city of St. Joseph, Missouri. He climbed a pole to which defendant's wires were attached, for the purpose of cutting "dead wires." When he cut the wires the pole was left without some of its support and fell with plaintiff to the ground, injuring him severely. He recovered judgment in the trial court.

Defendant's chief objection is that the case made for plaintiff by the evidence in his behalf, is insufficient in law to support a judgment. It appears from the testimony introduced by plaintiff that defendant. operated a telephone line in the city of St. Joseph,. Missouri, and that he was a lineman of ten years' experience and had been working for defendant for several months. That on the morning he was hurt, the defendant sent him and another lineman and a groundman (a man who worked on the ground) to cut out,. or cut off of the poles, what is called "dead wires." The other lineman was in charge or control of the

work and plaintiff designated him as the foreman and so we will treat him. On the morning of October 8, 1909, he and the two others were sent out in a wagon with tools to cut out dead wires. The mode of work, suggested by the foreman, was for him to climb the first pole while plaintiff climbed the next one further on; the foreman was to cut the dead wires and plaintiff, seeing the foreman cut the wires, would then cut the same on his pole. The foreman was then to descend, pass plaintiff at his pole and go on to the next, when he was to climb it and cut wires as before, then plaintiff was to go by the foreman to the next pole and go through the same work. Thus they were to alternate. When they arrived at the place, to begin work on the morning in question, the foreman said he would go up the pole at which they were standing and plaintiff would go to the next one, which was about one-half block further on, and when he saw that the foreman had cut the wires, he, plaintiff, would cut the same ones at his pole. The third, or groundman, was sent to a house opposite to plaintiff's pole and across the street from it, where he was to go up a ladder on a porch and cut a couple of wires that ran over from plaintiff's pole. Plaintiff went down to the next pole as directed. He said "I walked up against the pole and give it a couple of shakes and it seemed to be solid, so I went up;" and that "that was the customary inspection." After going up, he cut the wires the foreman had cut and then reached over to cut the wires the groundman had been directed to cut. The reason he gave for cutting these was that he got to them before the groundman across the street got to the other end of them, and that when he "cut, it let me into the street;" that is, when he cut these wires the pole only being supported by wires running in another direction, fell, and he received his injuries. It was then seen that while the pole looked sound at the

bottom, it was so rotted on the inside as to be unable to stand after the supporting wires running across to the house, were cut.

In many of the states the rule is stated, absolute, that a telephone company is not expected to have inspectors of its poles other than the linemen themselves. [Sias v. Consolidated Lighting Co., 73 Vt. 35; McIsaac v. Northampton Electric Lighting Co., 172 Mass. 89; Tanner v. New York, N. H. & H. R. A., 180 Mass. 572; DeFrates v. Chicago Union Tel. Co., 243 Ill. 356; Krimmel v. Edison Illuminating Co., 130 Mich. 613; Lynch v. Saginaw Valley Traction Co., 153 Mich. 174; Griffin v. New York Tel. Co., 125 N. Y. Supp. 642; Saxton v. Telephone Co., 81 Minn. 314.]

Other states make no distinction between telegraph and telephone companies and their linemen, and any other relation of master and servant and, except where the situation and nature of the service may be different, require the master in such case to furnish the servant with reasonably safe appliances and a reasonably safe place in which to work. In an elaborate opinion by WOODSON, J., in which there is a full examination of the authorities, wherein all phases of the question are discussed, this state is placed in the latter class. [Corby v. Telephone Co., 231 Mo. 417.] In speaking of directions given by the foreman to the linemen in that case, the judge said that "the telephone company owed them the same duty to inspect and furnish them with a reasonably safe place in which to work that all other masters owe to their servants in that regard." And further, that: "There is not a whit's difference in principle between a telephone company and any other master in that regard." And that telephone companies (italics ours): "Owe the same duty to their employees that all other masters owe to their servants *under like circumstances and conditions.*"

164 App.—9

Each of the contending parties in this case insists
that the rules stated in that case determine the con-
troversy in his favor. In view of this, we will com-
pare the facts of the two cases. In the Corby case
the plaintiff was one among several linemen, in charge
of a foreman, all of whom (as here) were engaged in
cutting wires from poles. The foreman went in ad-
vance of the men and inspected the poles and marked
out work for the linemen and pointed out to them
which poles were not safe and which ones they should
climb. That the foreman had not actually inspected
the pole plaintiff climbed, though the latter supposed
he had and relied upon it; and the foreman stood by
as he climbed up and handed him a hand-ax with which
to do some work up the pole.

Excepting that the same character of work was
being done, the foregoing facts bear little resemblance
to those we have stated in this case. There is no pre-
tense that plaintiff's foreman made any inspection
and the face of the record shows that plaintiff *knew*
he had not. In this respect the case is wholly unlike
that of Miller v. Tel. Co., 141 Mo. App. 462, where
the foreman declared the pole to be safe and for the
plaintiff to climb it. So, likewise, it is apparent that
plaintiff knew the defendant had not a separate force
of inspectors, for he had been working for defendant
for more than five months, and he stated he knew it
did not inspect. In this case, as soon as they came
to the place to begin work and before the foreman
was out of his presence, he sent plaintiff to the next
pole further on, telling him not to cut the wires until
*after* he had cut, as the pole he was going to climb
looked as though it might not support him. Plaintiff's
words were, "and he (the foreman) told me to go down
to the corner and cut what he cut and *wait* till he got
his cut *for the pole looked kind of weak he was on.*"
From this it is apparent that plaintiff knew the fore-

man had had no opportunity to inspect other poles and that no inspection was contemplated except that given by the linemen themselves. This is made still clearer by what the plaintiff did when he reached the pole. He says ''I kind of walked up against the pole and give it a couple of shakes and it seemed to be solid, so I went on up.'' And he stated that that was the usual inspection, and he had not in all his nine years' experience seen any other made ''as long as the pole shook solid.'' This seems to us to make clear that he did not consider the foreman had inspected and that he *did* consider he should inspect for himself. But there is no necessity for merely drawing conclusion in this important particular, for plaintiff expressly testified that he knew defendant never inspected, that they did ''not pay any attention to it, just let it go. They never went and looked around to see if anything was falling down or not that I know of.''

Plaintiff's nine or ten years' experience as a lineman had taught him, as he himself stated, all about the liability of poles to decay next to the ground, and there was no excuse for him to say, and he did not say, he expected and relied upon an inspection by the defendant, and his own acts demonstrate that. So the words of the foreman accentuated it when he expressed misgivings about his own pole; and when he sent plaintiff alone to the pole further on, it was no more than if he had sent him out from the company's office. The circumstances point to only one reasonable conclusion; that is, that plaintiff was to look out for himself. The direction of the foreman to go to that pole was in effect a direction to do his own inspecting independent of any reliance on the foreman. If the foreman had said to him, as he started, ''I have not inspected that pole,'' it would have been no more warning and have added no more knowledge than plaintiff already had; and therefore it is not a matter of wonder that plaintiff does not say he *relied upon,* or *expected,* an

inspection from any one else. It was shown—plaintiff himself so stated—that an ordinary way of testing decay at the bottom was either to take the dirt away with a shovel, or drive in a chisel or screw driver; and it was shown that these tools were in the wagon. Counsel say that plaintiff tested the pole "all he could with the means at hand." But the record does not bear out the statement. Plaintiff said he tested it in the usual way and he thought sufficiently. But it was shown, if he wished any other test, the tools *were* at hand in the wagon.

So it seems to us to be clear that if we refuse to make exceptional rules for governing the conduct of telephone and telegraph companies and their linemen, and apply to them the ordinary obligations and mutual duties between master and servant in ordinary cases, in similar circumstances and conditions, as held and applied by the Supreme Court in the Corby case, we must hold that the evidence in plaintiff's behalf shows him to be without legal standing and the judgment should be reversed. All concur.