[No. 9881. Department One. June 4, 1912.]

PATRICK J. MURPHY, *Respondent*, v. PACIFIC TELEPHONE
AND TELEGRAPH COMPANY, *Appellant*.[1]

MASTER AND SERVANT—SAFE PLACE—CONTRIBUTORY NEGLIGENCE—
ASSUMPTION OF RISKS—RELIANCE ON PROMISE—QUESTION FOR JURY.
Whether the master was guilty of negligence in failing to guy a
telephone pole, and whether a telephone lineman, injured by the fall
of two telephone poles, is guilty of contributory negligence or as-
sumes the risks, is for the jury, where it appears that a crew of men
under a foreman were engaged in resetting new poles on an old
line, the foreman directed the guying of all dangerous poles that
had to be ascended, which work was done by part of the crew work-
ing ahead of the plaintiff, that a dangerous corner pole was left
unguyed when it should have been guyed if the adjoining pole was
to be ascended, that the foreman directed the plaintiff to ascend the
adjoining pole, which he did without inspecting it or knowing that
the corner pole was unguyed, and was injured by the consequent
fall of the two poles; the plaintiff and his assistant having no
equipment for guying poles and the foreman having promised to do
the necessary guying; since the plaintiff had a right to rely on such
promise, if he did not know that it was not guyed, and the master
in such case assuming the risk from failure to guy the corner pole.

EVIDENCE—EXPERT EVIDENCE—OPINIONS. In an action for injuries
sustained by a lineman in the work of replacing old telephone poles,
an experienced lineman may, after describing the defective condi-
tion of a corner and an adjoining pole which fell, give his opinion
as an expert, in an answer to hypothetical questions, that the corner
pole should have been guyed before the adjoining pole was ascended.

MASTER AND SERVANT—RELATION—TELEPHONE COMPANY. The law
of master and servant applies to the relation existing between tele-
phone companies and their employees.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for
$25,000 reduced by the trial court to $20,000, for personal injuries
sustained by a lineman through the fall of telephone poles is
not excessive, where the plaintiff, 30 years of age, in good bodily
health and earning $3.75 per day, became through his injuries a
pitiable human wreck.

Appeal from a judgment of the superior court for Spo-
kane county, Hinkle, J., entered April 28, 1911, upon the
verdict of a jury rendered in favor of the plaintiff, for per-

[1]Reported in 124 Pac. 114.

sonal injuries sustained by a lineman through the fall of telephone poles.   Affirmed.

*Post, Avery & Higgins,* for appellant.
*Robertson & Miller,* for respondent.

Gose, J.—This action was brought to recover damages for injuries sustained by the plaintiff while an employee of the defendant.   There was a verdict in his favor for $25,000, which the court reduced to $20,000, and a judgment was entered for the latter sum.   The defendant has appealed.

The appellant interposed timely motions for a nonsuit, a directed verdict, and a judgment *non obstante veredicto.* The denial of these motions comprises the first three errors assigned.   The respondent, at the time he received the injuries for which he seeks redress in this action, was an experienced lineman, and working for the appellant in that capacity.   The appellant was then engaged in the work of repairing and straightening an old telephone line, estimated to be fifteen years old, between the towns of Pullman and Colton, in this state.   Broadly speaking, the work consisted of sawing off and resetting the old poles, setting new poles where the old ones were condemned, putting cross-arms onto the new poles, and transferring the wires thereto, straightening the line, and cutting out and cutting in transpositions and phantoms.   The appellant's injury was caused by the falling of two telephone poles, upon one of which he was working.

In support of these assignments, the appellant contends that it was guilty of no act of negligence, that it was the duty of the respondent to inspect the pole before climbing it, that he assumed the risks incident to his employment, and that his injury resulted from his own negligence.   These questions will be considered together.

The undisputed facts are:   That the appellant, at the time the respondent was injured, owned and operated a tele-

phone line between the towns of Pullman and Colton, and was engaged in the work of repairing and straightening it; that, in carrying on the work, it employed from fifteen to twenty-five men, consisting of a superintendent, a foreman, an assistant foreman, linemen, ground men, and teamsters; that at the time of the accident the working crew was divided into two main gangs, known as linemen and ground men; that there were usually one or more linemen with the ground men; that, a few days before the accident, the respondent and one Tamblin, who was also a lineman, were taken from the crew of linemen, where they had been working, and set at work by themselves, and directed to cut out and cut in transpositions and to cut in phantoms; that the line was an old line, about fifteen years of age; that it carried ten or twelve wires; that the corner poles on the old line were not guyed; that Armstrong was the superintendent; that Hursey was foreman in charge of the linemen; that Leech was assistant foreman in charge of the ground men; that the ground men preceded the linemen, and that their work comprised digging the holes and setting the poles; that Leech had authority to condemn and abandon such old poles as he deemed unfit to reset; that the line made a sharp curve about one hundred feet from the pole upon which the respondent was working; that the pole at the curve was known as a corner pole; that it was not guyed, and that it was the first pole to break and fall.

It is also undisputed that Leech had condemned both the corner pole and the pole which the respondent climbed; that he had set two new poles, ten and fifteen feet distant, respectively, from the former, and one ten feet from the latter; that both the superintendent and the foreman Hursey knew these facts; that each foreman knew that the corner pole was not guyed, and that the setting of a new pole near an old one is notice to an experienced lineman that the latter is to be abandoned. The foreman, Hursey, testified that he guyed all poles that were to be climbed that he considered dangerous. His testimony touching that subject is as follows:

"Q. Is it not a fact that you guyed every pole on that line that men went up, or that you thought were dangerous while they were climbing them and coming down? A. Why yes, what I thought was dangerous. Q. You did that for the safety of those men, is that correct? A. Yes, sir. Q. You not only did that but you guyed poles that you thought were dangerous for men to go up and come down? A. Yes, sir. Q. And you did that without the men instructing you to do it? A. Yes, sir, I guyed them up when I thought it was unsafe."

The respondent testified that the appellant was putting in a new type of transpositions, which means the crossing of wires in order to produce certain defined results; that, a few days before he received the injury, the foreman Hursey gave him certain orders, which he described as follows:

"A. We had this part of the work laid out for us as given us by Mr. Hursey, and when he gave us the orders to go and do this work, 'Now,' he says, 'I will take charge of the other linemen; we will be ahead and do all the guying and everything; you fellows go and cut these phantoms and cut out the old transpositions and'—well, we were presented with a blue print to go by, that is all."

He further testified that there were no transpositions on the corner poles, and that he received a definite order from Hursey a few minutes before the accident to cut out the transposition on the pole that fell upon him. His testimony touching this order is as follows:

"On this particular morning of the accident, we got a definite order that morning from Mr. Hursey to go up and cut out that transposition, but at other times, no. Q. That was the only time that you received a definite order, was the morning of the accident? A. Yes, sir, that is correct."

His testimony upon the question of inspection is as follows:

"Q. Did you have anything to do with the inspection of any of the poles that you were sent upon to cut out the transmissions? A. No, I did not have no business especially because I—well, anybody where there is a gang of linemen, anybody does that, on any job, on any work, where there is

a gang of men ahead of the gang of linemen, laying out everything O. K. and cutting off the poles and dropping them in and setting new ones, well, that is a fair warning, he knows everything ought to be O. K. ahead doing the work."

Both he and Tamblin testified that linemen do not inspect adjoining poles before climbing a pole; that they had no material or equipment for guying poles or testing their soundness. Touching the question of whether the linemen were in advance of him when the accident happened, the respondent on cross-examination testified:

"Q. You don't know how far back of you the linemen were at that time? A. No, sir, I did not notice anything about that. Q. But you know they were back of you somewhere? A. Well, there might have been some ahead. I would not say if there was or if there was not. Q. I understood you to say a few minutes ago— A. You see I did not keep posted— Q. Just a minute. I understood you to say a few minutes ago that that forenoon that you and Tamblin were ahead of the other linemen? A. You misunderstood all the way along if you understood that. I told you that at the time of the accident we were ahead of the linemen; not that forenoon. Q. When was it you got ahead of the linemen? A. I am just telling you, at this particular time, the pole we were working on, whether the linemen were ahead or back, mind you, I did not keep a record and did not have nothing to do with them linemen."

He further testified, that he did not know whether Leech had a lineman with him at the time in question; that he did not notice the new pole near the pole he climbed; that he passed within one hundred feet of the corner pole but took no notice of it; that he did not know that it was not guyed, and that he did not inspect the pole that he climbed. Leech testified that the condition of the corner pole was such that it should have been guyed if an adjoining pole was to be climbed, and that he said nothing about its condition before the respondent was injured. The respondent's testimony also discloses that, before he commenced cutting out transpositions, he had worked with the linemen and in that capac-

ity had guyed corner poles, and that he had never known
ground men to guy them. The testimony shows further that
the heaviest strain is upon the corner pole, and that its
falling produces a slack in the wire which is likely to cause
the adjoining pole to fall.

From the facts stated, it is clear that the respondent could
rely upon the promise of the foreman that he would do the
guying, unless he knew that the promise had not been kept.
It is equally clear that, under the testimony, it was for the
jury to determine whether the master, in the exercise of
reasonable care, should have guyed the corner pole, if the
foreman knew that the respondent, in the performance of
his work, would ascend the adjoining pole.

The appellant strenuously contends, and it is repeated
many times in its brief, that the respondent knew that the
linemen were behind him when he climbed the pole, and conse-
quently must have known that the corner pole was not guyed.
It must be admitted that his testimony in this respect is con-
tradictory. We think, however, that the jury, upon the
testimony we have quoted, were warranted in concluding that
he did not know whether the linemen were in advance of or
behind him, and that he had proceeded with his work in con-
sequence of the order and the promise, without charging his
mind with or observing their position on the line of work.
The record shows that the linemen did not work as a unit,
but that they were scattered along the line as the exigencies
of the work required. It is clear from all of the testimony,
that the falling of the corner pole was the proximate cause
of the accident. If the case depended upon the failure of
the respondent to use his eyes and take notice of the new
pole which had been set by the one he climbed and his failure
to inspect the latter pole, it would fall within the rule an-
nounced by this court in *Anderson v. Inland Tel. & Tel. Co.*,
19 Wash. 575, 53 Pac. 657, 41 L. R. A. 410; *Goddard v.
Interstate Tel. Co.*, 56 Wash. 536, 106 Pac. 188, and *Hord
v. Pacific Tel. & Tel. Co.*, ante p. 119, 122 Pac. 598. The

facts in the case at bar clearly differentiate it from the
rule announced in those cases. Those were cases where a
single lineman or trouble man, without the presence of a
foreman or a promise to afford protection against danger,
was injured through his failure to take reasonable precau-
tions for his own safety. The cases cited by the appellant,
where a single lineman was injured or where one of two or
more linemen of equal authority was injured and there had
been no inspection by the master, are not in point. Nor are
the cases controlling where there was a foreman present and
only the pole that was ascended fell. As Judge Lurton
tersely said in *Britton v. Central Union Telephone Co.*, 131
Fed. 844:

"It would seem quite impracticable and unreasonable to
send one man as an inspector with another of equal fitness to
test a pole before climbed by the latter."

This is the underlying principle in the *Anderson, God-
dard*, and *Hord* cases. It is well settled that the doctrine
of assumption of risk by the servant is based upon con-
tract. In the case at bar, if the foreman promised to do
the necessary guying, the master assumed the risk result-
ing from its failure to guy the corner pole. The relation
of master and servant exists in the case at bar, and the
law applicable to that relation applies with the same force
to telephone companies as to other masters except as dif-
ferentiated by the exigencies of the particular case. *Anus-
tasakas v. International Contract Co.*, 57 Wash. 453, 107
Pac. 342; *Alkire v. Myers Lumber Co.*, 57 Wash. 300,
106 Pac. 915; *McLeod v. Chicago, Milwaukee & P. S.
R. Co.*, 65 Wash. 62, 117 Pac. 749; *Corby v. Missouri &
K. Tel. Co.*, 231 Mo. 417, 132 S. W. 712; *Cumberland Tel.
& Tel. Co. v. Bills*, 128 Fed. 272; *Tracy v. Western Union
Tel. Co.*, 110 Fed. 103; *Western Union Tel. Co. v. Holtby*,
29 Ky. Law 523, 93 S. W. 652; *McDonald v. Postal Tel.
Co.*, 22 R. I. 131, 46 Atl. 407.

In the *Holtby* case, in considering this question, the court said:

"There are exceptions to the rule that relieve the master from liability when the servant is injured by appliances or tools or unsafe places, when the danger is one that might have been discovered by the servant by the exercise of ordinary care. Among them, and applicable to the facts in this case, is the doctrine that although an appliance, tool, or place may be unsafe, and the danger discoverable by reasonable or ordinary inspection, yet if the master is present and orders the servant to perform the duty, or the servant depends on the master's presumed knowledge of the defective appliance or unsafe place, or relies on the master's inspection of the premises, and acts under his immediate direction, the master will be liable."

From what has been said, it is manifest that, whether the respondent assumed the risk or was guilty of contributory negligence were questions for the jury. In *McGorty v. Southern New England Tel. Co.*, 69 Conn. 635, 38 Atl. 359, 61 Am. St. 62, cited by the appellant, and referred to in both the *Anderson* and *Hord* cases, there was a foreman present who sent the plaintiff up the pole which fell, but the plaintiff knew that it had been safely climbed by another lineman, and he had himself climbed it in safety about an hour before the happening of the accident.

Leech, an experienced lineman and the foreman of the ground men, after stating that the corner pole was decayed, leaning, and had been condemned by him upon its general appearance, was permitted to express his opinion as an expert that before an adjoining pole was climbed the corner pole should have been guyed. Other expert witnesses were permitted to give like answers to hypothetical questions. This is assigned as error. It is argued that the witnesses should have been limited to a statement of the attending facts; that is, to stating the age of the pole, its appearance, the character of the wood and the soil, and the weight and strain upon the pole. We think the better view is that it

was a subject for the opinion of an expert. The subject was one requiring skill and knowledge not possessed by the ordinary man. *Smith v. Dow*, 43 Wash. 407, 86 Pac. 555; *Luper v. Henry*, 59 Wash. 33, 109 Pac. 208; *Wabash Screen Door Co. v. Black*, 126 Fed. 721; *St. Louis, A. & T. R. Co. v. Johnston*, 78 Tex. 536, 15 S. W. 104; *International & G. N. R. Co. v. Mills*, 34 Tex. Civ. App. 127, 78 S. W. 11; *Cincinnati & Z. R. Co. v. Smith*, 22 Ohio St. 227, 10 Am. Rep. 729; *Fitts v. Cream City R. Co.*, 59 Wis. 323, 18 N. W. 186; *Storrie v. Grand Trunk Elevator Co.*, 134 Mich. 297, 96 N. W. 569; *Bonebrake v. Board of Com'rs etc.*, 141 Ind. 62, 40 N. E. 141; *Indiana Bituminous Coal Co. v. Buffey*, 28 Ind. App. 108, 62 N. E. 279.

In *Smith v. Dow*, which was an action to recover for personal injuries alleged to have resulted from the negligence of the defendant in the negligent tying of packages of flooring which was being hoisted from the first to the upper floors of a building, it was held competent for expert witnesses to testify as to what was the proper way to tie the packages. In *Luper v. Henry*, it was held competent for an expert to testify, in answer to a hypothetical question, that a platform on which was stationed a donkey engine employed in hoisting gravel and cement was not properly or safely constructed. In the *Black* case, Weatherford, an expert, was permitted to testify with respect to whether a pulley similar to that which burst was safe. In addressing itself to the question of the admissibility of this evidence, the court said:

"Now, in the present case, Weatherford was not asked to testify whether it was prudent for the company to use the pulley. It was for the jury to say whether the company was negligent or not in using the pulley. But it was necessary for the jury to know whether the pulley used was safe or unsafe, suitable or defective. If it was safe it was not defective, and if it was defective it was not safe. Weatherford was permitted to testify that the pulley described to him in the question would, in his opinion, be unsafe—that is, defective—and he gave in detail the reasons for his opinion, point-

ing out wherein such a pulley would be inherently weak and liable to fly in pieces. Now, that was peculiarly a question for an expert. The strength of materials, when combined in a piece of machinery operating in a certain way, is a thing not open to common knowledge, but requires special skill, experience, and investigation to estimate. Weatherford had qualified as an expert, and what he said came properly within the range of expert testimony."

The appellant has cited cases holding that it is not competent to ask a witness what was "prudent" (*Bruce v. Beall*, 99 Tenn. 303, 41 S. W. 445); or whether certain acts were a "sufficient precaution" (*Bergquist v. Chandler Iron Co.*, 49 Minn. 511, 52 N. W. 136); or whether a certain anchor rope was "an ordinarily safe and proper appliance for the work for which it was used" (*Hunt v. Kile*, 98 Fed. 49); or whether the method used in coupling cars was "dangerous, careless and injudicious" (*Seese v. Northern Pac. R. Co.*, 39 Fed. 487); or "as to the best and safest mode of loading car wheels on a flat car" (*Southern R. Co. v. Mauzy*, 98 Va. 692, 37 S. E. 285); or as to what an ordinarily prudent man would have done under like circumstances as those that surrounded the plaintiff, and what witness would have done had he been placed in the plaintiff's situation [*Sonnefield v. Mayton* (Tex. Civ. App.), 39 S. W. 166]; or to permit a witness to testify that an engineer was careless or incompetent (*Stoll v. Daly Min. Co.*, 19 Utah 271, 57 Pac. 295). This line of testimony was condemned because what was prudent or negligent or what an ordinarily prudent man similarly situated would have done were the very questions the jury were to decide. In this case, the first question for the jury to determine was whether the appellant had been guilty of actionable negligence. We think that, after the attending conditions had been shown by the witness, it was competent for him to state whether the corner pole should have been guyed. It was not a matter of such common knowledge as to preclude expert opinion. Moreover, the undisputed facts in the case take all the sting out of the testimony. It

is admitted that both foremen knew that two new poles had been set near the corner pole, and that it had been condemned and abandoned.

The appellant criticises certain instructions which are in harmony with the views we have expressed as to the law applicable to the case. Indeed, much of the appellant's argument, if we catch its spirit, is predicated upon the theory that the law applicable to telephone companies is something apart from the general law of master and servant. With this view we cannot agree. As we have already stated, the law of master and servant applies in all its vigor to the relation between such companies and their employees, excepting as the circumstances surrounding the particular case make such rules impracticable and unreasonable.

It is urged that the judgment is excessive. It suffices to say that the respondent was a married man, thirty years of age, in good bodily health, earning $3.75 per day when he sustained his injuries, and that he is now a pitiable human wreck.

The many errors assigned by the appellant cannot be separately considered without extending the opinion to an unreasonable length. We have undertaken to group them and discuss the principles which they involve. We have read all of the testimony, and have patiently examined all of the assignments, and think that the judgment should be affirmed, and it is so ordered.

DUNBAR, C. J., PARKER, MOUNT, and FULLERTON, JJ., concur.